**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 18, 2015**

# In the Court of Appeals of Georgia

A14A1803. AMEY v. THE STATE.                                  BO-066C

BOGGS, Judge.

Marcus Amey appeals from his convictions for armed robbery, aggravated assault, possession of firearm during commission of a felony, and possession of a firearm by a first offender probationer. He contends that the trial court erred by admitting evidence of a prior attempted robbery and that his trial counsel provided ineffective assistance of counsel. We find merit in Amey's contention that the prior attempted robbery should not have been admitted into evidence, and we therefore reverse.

The record shows that the charges at issue in this appeal arose from the September 26, 2011 robbery and aggravated assault of a woman in an apartment

complex parking lot. The prior crime took place on September 29, 2008 and involved the attempted robbery of a woman outside her home.

*September 26, 2011 Robbery*

The victim testified that when she drove into her apartment complex around 2:00 a.m., she saw a "very noticeable" red car that looked as if it was leaving the apartment complex. After she passed it, she checked her rear view mirror and noticed that it was following her. She parked and waited a couple of minutes "to let the car park or go wherever they're going to go," because she "felt at that moment that something wasn't right." She saw the car park in front of a different building in the apartment complex and heard a car door close before getting out of her car and walking toward her building.

When she looked behind her, she saw a fit, six-foot tall black male, wearing all black with a tight-fitting tank top. She locked eyes with him, "[a]nd that's when he got the gun and came at me and pointed it to my head." She tried to dial 911, but was unable to do so. The man placed the gun to the back of her head, told her to turn around, and stated, "I know you have money." After the victim denied having any money, he told her to lie on the ground and start counting. While she was counting, he grabbed her Coach purse which contained $10, her wallet, a rim lock, and papers.

When she glanced up as he started to walk away, he told her, "Turn around." She heard him get into a car and leave. After she "felt that the car left, [she] called 911." Following her initial report to the police, the victim called back to add that she had determined from online research that the red car she had seen was a Dodge Magnum.

The victim testified that a street light "was working that night, which is angling to where - - toward where the incident happened, so it's visible." She believed that there was more than one person in the red car and that the person who robbed her was the passenger, but she acknowledged that she could not see how many people were in the car. She heard the car running during the entire encounter and it was "an in-and-out type thing." She was not certain how long she interacted with the robber, but guessed it was "anywhere between five and ten minutes."

On September 27, 2011 at 7:19 p.m., a police sergeant stopped a red Dodge Magnum after it made an unsafe lane change based upon a BOLO for the same make and model. The car was occupied by three women and one man, Amey, who occupied the right rear passenger seat. After giving the driver a warning, the sergeant "sent everybody on their way." While completing paperwork on the traffic stop, the sergeant realized that one of the female passengers had an outstanding arrest warrant.

Based upon his recollection of where the driver lived, he went to nearby gas station to keep watch for the car. At 8:09 p.m., he saw the red Dodge Magnum approaching with one front headlight out. When he stopped the car again, it was occupied by the same four people sitting in the same location. He placed the female passenger under arrest for the outstanding warrant. After she stated that she wanted to give her personal belongings to Amey, the sergeant asked Amey to step out of the car.

The victim drove past the location of the traffic stop and called 911 to report that the police had stopped a car similar to the one involved in her robbery. A detective investigating the robbery testified that when he called the victim back, she stated that "a large, heavyset black male standing outside of the vehicle . . . appeared to be the person that had robbed . . . her."[1] The victim testified that the location where she saw the red Magnum was "[l]iterally across the street from one of the entrances of my apartments." Based upon a conversation with the detective investigating the robbery, the sergeant transported Amey and the vehicle "up to headquarters" while a search warrant was being obtained.

---

[1] In her testimony, the victim denied seeing Amey standing near the car.

A search of the car revealed a handgun in the rear hatch compartment behind a large speaker box mounted on the backside of the rear passenger seat. At the time of the second traffic stop, a retractable cover used to hide the contents of the hatch compartment was in place; the detective who searched the vehicle testified that it would have been possible for a rear passenger to place the gun in the hatch compartment by reaching "between the [rear] seat and that retractable cover into the back cargo area of the vehicle." No items belonging to the victim were found in the car or in a search of the apartment where Amey was staying.

A detective showed the victim a photographic line-up several hours after she called to report that the police had stopped the red Magnum involved in her robbery. The victim pointed to Amey's photo and stated, "This one looks closer to the description than any other. Do you know his height?" The detective responded, "Do me a favor, go ahead and circle number 3." At trial, he explained that he asks all witness to circle a picture to which they have pointed. The victim testified that at the time of the line-up, she was 75% certain that the man she identified was the one who had robbed her. At trial, she stated that she "was more than 50% sure" and that she selected "[t]he one that [she] thought was the best one that [she] felt was available at the time of the incident." The victim explained that she was not 100% certain because

"it was nighttime. It wasn't perfect . . . lighting, but enough for me to see." She testified that she was able to identify him as the robber during the trial because "[h]e looks like the individual that attacked me that night."

*September 29, 2008 Robbery*

The victim testified that after she arrived home around 10:00 p.m. and parked in her driveway, two men approached her while she was unloading items from the trunk of her car. The men were wearing black bandanas over their faces, and one of them pointed a gun at her head. When they told her they wanted money, she gave them her purse. After searching the purse and finding no money, the men asked for the victim's car keys. She asked for permission to remove something from the trunk before they took her car, and the men then decided to leave without taking anything from her.

The victim called the police and gave the following description of the men: they were dressed in all black; one was tall and carrying a book bag; and the other was "short and chubby." According to the victim, the tall one held the gun and did most of the talking. She explained that she could not identify their race because she could not see their faces.

A few minutes after a description of the men was dispatched, a patrol officer saw two men matching the description walking out of a subdivision "in the immediate area of the robbery." The officer testified that "[o]ne of the individuals was wearing a red shirt and black shorts, and the other was wearing a white shirt and black shorts." Additionally, one of them, later identified as Mr. Hitchins, was carrying a backpack. The officer explained that he believed they matched the description even though they were not wearing all black because "in instances of robbery or even burglaries, . . . it's . . . common for the people that are responsible to shed clothing or have an extra shirt with them." When the officer patted Hitchins down for weapons while talking with him about the recent robbery, a gun fell out of his shorts. Both Hitchins and the second man, Amey, were arrested, and a search of Amey revealed a black do-rag in his shorts. The officer discovered two black t-shirts and a black bandana when he searched the backpack. The officer testified that one of the t-shirts was large enough to fit Amey.

After the State presented the above evidence, it introduced, without objection, a copy of Amey's first offender plea to criminal attempt to commit robbery, as well as a copy of the indictment for armed robbery.

*Admission of Prior Robbery*

After the State gave notice of its intent to present evidence of the prior robbery, the trial court held a hearing as required by Uniform Superior Court Rule 31.3 (B). In July 2012, the trial court ruled that the prior robbery could be admitted to "to show intent, course of conduct[,] and bent of mind." During the trial, which took place in January 2013, the State acknowledged application of the new Evidence Code and sought to admit the prior robbery for "identity, proof of motive, and opportunity." After again weighing the probative value of the evidence against its prejudicial impact, the trial court allowed the evidence for each of the new reasons identified by the State. The court also granted Amey's request for a continuing objection to the evidence.

1. Amey contends the trial court erred by admitting evidence of the other crime because it was not admitted for a proper purpose. As Amey's trial took place after January 1, 2013, we must apply Georgia's new Evidence Code to determine if the trial court properly admitted evidence of the attempted robbery that took place nearly three years before the robbery for which Amey was tried. Ga. L. 2011, pp. 99, § 101.

The Supreme Court of Georgia recently held that "where the new Georgia rules mirror their federal counterparts, it is clear that the General Assembly intended for

8

Georgia courts to look to the federal rules and how federal appellate courts have interpreted those rules for guidance." *Parker v. State*, Ga. (Case No. S14A1005, decided February 16, 2015). See also *Jones v. State*, 326 Ga. App. 658, 660 (1) (757 SE2d 261) (2014). Additionally, in the event of any conflicting interpretations between the Eleventh Circuit and other federal circuit courts, we must follow the Eleventh Circuit rule. *Bradshaw v. State*, Ga. (3) (Case No. S14A1365, decided March 2, 2015). The new Georgia evidence rule governing the admission of other crimes, OCGA § 24-4-404 (b),[2] tracks Federal Rule of Evidence 404 (b),[3] and the

---

[2] OCGA § 24-4-404 (b) provides in relevant part: "Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[3] Federal Rule of Evidence 404 (b) states in relevant part: "(1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. (2) *Permitted Uses; Notice in a Criminal Case*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

balancing test embodied in OCGA § 24-4-403[4] mirrors Federal Rule of Evidence 403.[5] Id.

The Eleventh Circuit uses a three-part test to determine if evidence of other crimes or acts can be admitted pursuant to Federal Rule of Evidence 404 (b): "(1) the evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; and (3) the government must offer sufficient proof so that the jury could find that defendant committed the act." (Citation, punctuation and footnote omitted.) *Bradshaw*, supra. On appeal, we review a trial court's decision to admit evidence of other crimes "for a clear abuse of discretion." (Citation and punctuation omitted.) Id.

Amey contends that the evidence of the other robbery attempt was inadmissible because the State failed to prove that it was relevant to an issue other than his character. As the United State Supreme Court explained more than 60 years ago:

[4] OCGA § 24-4-403 states: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[5] Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

(Citations and footnotes omitted.) *Michelson v. United States*, 335 U. S. 469, 474-76 (69 SCt 213, 93 LEd 168) (1948).[6]

To satisfy the first prong of the test for admission of another crime, the State must show that evidence of Amey's prior attempted robbery is relevant to an issue other than his character, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-404 (b). "Any evidence is relevant which logically tends to prove or to disprove a material fact which is at issue in the case, and every act or circumstance serving to elucidate or to

---

[6] While this decision preceded the adoption of the Federal Rules of Evidence, it provides the historical context behind the prohibition of such evidence. See Pub. L. 93-595, 88 Stat. 1926 (1975).

11

throw light upon a material issue or issues is relevant." (Citation and punctuation omitted.) *Woodall v. State*, 294 Ga. 624, 632 (7) (754 SE2d 335) (2014).

(a) *Identity.* "Evidence of independent crimes, wrongs, or acts only proves identity, as distinguished from the defendant's bad character, or propensity to commit a crime, when the other incidents are similar to the charged defense in distinct ways that serve as the defendant's signature." Paul S. Milich, Georgia Rules of Evidence § 11:13 at 326 (2014-2015 ed.). See also *Maggard v. State,* 259 Ga. 291, 293 (2) (380 SE2d 259) (1989) ("If for example, the evidence is being presented to prove the *identity* of the perpetrator offense charged, a long list of similarities between or among the crimes might be necessary to show that the crime bears the defendant's 'criminal signature'"(Emphasis in original.)).

> A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies, or rapes.

(Citation and punctuation omitted.) *Harper v. State*, Ga. App. (2) (b) (Case No. A14A2019, decided January 28, 2015). The inference of identity flowing from the

other crime "must be extremely strong" and "bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual." (Citation and footnote omitted.) *United States v. Myers*, 550 F2d 1036, 1045-1046 (5th Cir. 1977).[7] See also *Usher v. State*, 290 Ga. App. 710, 712 (1) (659 SE2d 920) (2008) (physical precedent only) ("the prior bad act and the charged offense must be 'so nearly identical in method as to earmark both the prior bad act and the charged offense as the handiwork of the accused" (Citation and punctuation omitted.)).[8]

In this case, the State failed to prove that Amey's prior attempted robbery was so similar to the charged offense that the charged offense must have been his handiwork. Robbery of a woman alone at night after she has parked her car "is not in the nature of a signature so as to be proof of the perpetrator's identity." *Jones v. State*, 236 Ga. App. 330, 333 (1) (c) (511 SE2d 883) (1999) (prior guilty pleas to armed robbery not probative of identity in subsequent robbery). See also *Cole v. State*, 216 Ga. App. 68, 69-70 (1) (453 SE2d 495) (1994) (previous robbery inadmissible to

[7] The Eleventh Circuit has adopted as binding precedent decisions made by the Fifth Circuit handed down on or before September 30, 1981. *Bonner v. City of Prichard*, 661 F2d 1206, 1209 (II) (11th Cir. 1981).

[8] At pointed out by Professor Milich, "'similarity' per se is not an exception to the character rule but only a piece of the larger issue of whether the evidence" can be admitted for a proper purpose. Milich §11:13 at 338.

13

prove identity in later robbery); *United States v. Lail*, 846 F2d 1299, 1301 (11th Cir. 1988) (traits common to many bank robberies did not provide evidence of a signature trait). Compare *Peoples v. State*, 295 Ga. 44, 54-55 (4) (b) (757 SE2d 646) (2014) (evidence of prior robbery admissible to prove identity where same gun used in robbery and charged offense of home invasion).

(b) *Motive*. Evidence of another crime may be admitted "to show the defendant's motive for committing the crime with which he is charged," but not to demonstrate "a propensity to act in accordance with the character indicated by that [other crime or] conduct." *United States v. Cunningham*, 103 F3d 553, 556 (7th Cir. 1996). "Motive has been defined as the reason that nudges the will and prods the mind to indulge in the criminal intent. *United States v. Beechum*, 582 F2d 898, 912 n.15 (5th Cir. 1978)." (Punctuation omitted.) *Bradshaw*, supra, slip op. at 12. "For example, the prosecution may establish impecuniousness as a motive for robbery by showing that the defendant had been threatened for nonpayment of a debt incurred in a drug transaction." *Beechum*, supra, 582 F2d at 912 n.15.

As the Seventh Circuit Court of Appeals has explained in more detail:

"Propensity" evidence and "motive" evidence need not overlap. They do not, for example, when past drug convictions are used to show that the

14

defendant in a robbery case is an addict and his addiction is offered as the motive for the robbery. They do overlap when the crime is motivated by a taste for engaging in that crime or a compulsion to engage in it (an "addiction"), rather than by a desire for pecuniary gain or for some other advantage to which the crime is instrumental in the sense that it would not be committed if the advantage could be obtained as easily by a lawful route. Sex crimes provide a particularly clear example. Most people do not have a taste for sexually molesting children. As between two suspected molesters, then, only one of whom has a history of such molestation, the history establishes a motive that enables the two suspects to be distinguished. But the principle that we are discussing is not limited to sex crimes. A "firebug" - - one who commits arson not for insurance proceeds or revenge or to eliminate a competitor, but for the sheer joy of watching a fire - - is, like the sex criminal, a person whose motive to commit the crime with which he is charged is revealed by his past commission of the same crime. The greater the overlap between propensity and motive, the more careful the district judge must be about admitting under the rubric of motive evidence that the jury is likely to use instead as a basis for inferring the defendant's propensity, his habitual criminality, even if instructed not to. But the tool for preventing this abuse is Rule 403, not Rule 404(b).

Id. at 556-557.

Here, the State asserts that the "evidence makes clear that the motive for the instant and the prior crime was to gain money" because "Appellant demanded money

15

from both women." But "[t]he fact that the accused has committed one kind of crime in the past does not, without more, prove his motive to commit the same kind of crime again. Such logic would make all prior robberies admissible in any robbery case, all prior murders admissible in any murder case, and so on." Milich, § 11:13 at 318.

"Numerous courts have recognized that evidence of an imminent financial burden on the defendant is admissible for the purpose of proving motive." *United States v. Reed*, 700 F2d 638, 643 (III) (11th Cir. 1983). In the case before us, the State presented evidence that Amey had no job and was sleeping on a futon in the living room of friends at the time of the 2011 charged offense. But in order for the prior attempted robbery to be relevant to the issue of motive, the State would also have had to present evidence showing that Amey lacked a job or had some other *specific* need for money at the time of the 2008 attempted robbery. The attempted robbery would then be relevant to show that Amey was willing to commit robbery when he had a *specific* need for money. See *Bradshaw*, supra ("evidence of Ohio murder was relevant to motive because it demonstrated appellant's willingness to use violence when he or someone close to him is cheated in a drug deal").

Based upon the State's failure to present evidence of Amey's impecuniousness at the time of the prior attempted robbery, we conclude that motive was not a proper

purpose for admitting such evidence. As a sister state has recognized, "[t]he general motive of gaining wealth, which could be the underlying basis for almost any crime, is not sufficient to establish a motive." *State v. Leday*, 97 So3d 501, 506 (La. App. 2012) (concluding evidence of prior robbery inadmissible to show motive in later robbery case). See also *Reed*, supra (trial court erred in allowing evidence of defendant's past bankruptcy in embezzlement case where there was no showing that defendant was unable to pay off his debts at the time of the embezzlement).

(c) *Opportunity*. Professor Millich characterizes opportunity as "probably the most rarely used purpose of those listed in [Rule] 404 (b). It admits evidence that relates to the defendant's *specific* ability or wherewithal to commit the crime charged." (Emphasis supplied.) Milich § 11:13 at 318.

In this case, the prior attempted robbery has no connection to the charged robbery that took place almost three years later; it therefore did not provide evidence of Amey's specific ability to commit the charged crime. Compare *United States v. DeJohn*, 638 F2d 1048, 1051-1052 (II) (7th Cir. 1980) (defendant's prior bad act of taking a check from an internal YMCA mailbox provided evidence of his opportunity to take different checks from the same area that he later attempted to cash). While the State presented evidence showing that Amey was living in close proximity to the

17

location of the charged offense at the time it was committed, it did not present corresponding evidence of Amey's proximity in connection with the prior robbery at the time it was committed almost three years before. Consequently, opportunity was not a proper ground for admission of the prior robbery evidence.

(d) *Harm*. Having concluded that none of the reasons identified by the trial court provided a proper purpose for admission of the prior attempted robbery, we must now determine whether the trial court's error in admitting such evidence requires a new trial. The Supreme Court recently reiterated:

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.

(Citations and punctuation omitted.) *Peoples*, supra, 295 Ga. at 55 (4) (c).

Here, we cannot say that it is highly probable that the admission of the prior attempted robbery did not contribute to the verdict. The evidence against Amey was not overwhelming. He was not apprehended in the distinctive car immediately after the robbery, but instead over a day later. None of the victim's belongings were

18

recovered, and her identification of him was far from certain. At the time of the photo lineup, the victim knew that the police had stopped a car matching the one involved in her robbery. She initially stated that he looked "closer to the description than any other" person in the lineup and asked the detective for information about his height. Instead of providing the requested information, the detective instructed her to circle the number associated with Amey's photograph. At the time of the line-up, she was only 75% certain that she had identified the robber, and at trial she stated that she "was more than 50% sure" and that she selected "[t]he one that [she] thought was the best one that [she] felt was available at the time of the incident."

As in *Usher*, supra, the evidence against Amey "was legally sufficient, but not overwhelming." 290 Ga. App. at 711-713 (1). Based upon the inherently prejudicial nature of other crime evidence and the lack of overwhelming evidence against Amey, we must reverse. Id. *Lail*, supra, 846 F2d at 1301-1302 (erroneous admission of prior robbery not harmless).

2. We need not address Amey's ineffective assistance of counsel claim as it is rendered moot by our holding in Division 1.

*Judgment reversed. Barnes, P. J., and Branch, J., concur*.

19