In the Supreme Court of Georgia

Decided:   June 20, 2016

S16A0524.  HICKMAN v. THE STATE.

THOMPSON, Chief Justice.

Appellant Marshae O'Brian Hickman was convicted of the attempted rape

and murder of Candice Parchment.[1]  He appeals, asserting, inter alia, the trial

court erred in joining these offenses for trial because they occurred several

months apart.  Finding no error, we affirm.

---

[1] The attempted rape was committed on January 5, 2010.  The murder occurred on
April 28, 2010.  Appellant was indicted on July 11, 2012, and charged with attempted rape,
false imprisonment, two counts of aggravated assault, and battery.  In a second indictment
filed the same day, appellant was charged with malice murder, two counts of felony murder,
two counts of aggravated assault, and two counts of concealing the death of another.  Trial
commenced on April 8, 2013, on both indictments.  The jury returned its verdict on April 12,
2013.  With the exception of one count of felony murder (as to which the jury concluded
appellant was guilty of involuntary manslaughter), the jury found appellant guilty of all
counts on both indictments.  The trial court sentenced appellant on April 26, 2013, to life
without the possibility of parole for malice murder and ten years consecutive for concealing
the death of another, 30 years for attempted rape, 20 years for an aggravated assault
occurring on January 5, 2010, and10 years for false imprisonment, to be served concurrently
with the sentences imposed for malice murder and concealing the death of another.  The
remaining counts were vacated and merged by operation of law.  See Malcolm v. State, 263
Ga. 369 (434 SE2d 479) (1993).  Appellant filed a motion for new trial on May 1, 2013.  The
motion was denied on March 4, 2015.  Appellant's notice of appeal was filed on April 1,
2015.  The case was docketed in this Court for the January 2016 term and submitted for
decision on the briefs.

1. Viewed in a light favorable to the verdict, the evidence showed the following: Appellant and the victim went to high school together, along with Jermaine Robinson,[2] a second assailant. Appellant and Robinson wanted to have sex with the victim, who, unaware of their plans, went with appellant and Robinson to an abandoned house in the victim's neighborhood. Meanwhile, the victim's mother realized her daughter was missing and began searching for her.

When appellant, Robinson and the victim entered the abandoned house, appellant told Robinson to hit the victim in the head with a rake and choke her, while appellant blocked the door to prevent her escape. Appellant groped the victim while Robinson choked her and tried to hold her down on a mattress. While the attack was taking place, the victim's mother drove up to the abandoned house. When appellant and Robinson saw the lights of the mother's car, they let the victim go. As the victim ran away, appellant threatened to kill her if she told anyone what happened. The victim ran up to her mother's car and jumped in. She was "in a panic" and told her mother "somebody tried to rape me," but she managed to escape when the assailants saw the car approach the

---

[2] Robinson pleaded guilty to attempting to rape the victim and testified at trial against appellant.

abandoned house. The mother urged the victim to go to the police, but she refused to do so. The attack transpired on the evening of January 5, 2010.

Subsequently, the victim told a close friend, Danny Jackson, about the incident. Jackson approached Robinson and warned him to stay away from the victim. When Robinson told appellant that the victim was telling others about the attempted rape, appellant responded that Robinson should not worry about the victim.

Three months later, on April 28, 2010, the victim's mother awoke to find the victim missing. The mother telephoned the victim numerous times to no avail. She contacted police to report the victim missing. Eventually, she received two text messages, which were purportedly from the victim. The first stated, "I am okay." The second read, "I am in Tennessee." The mother did not believe the victim sent the texts.

Several months passed. The mother continued the search effort for the victim until November 2010, when the victim's remains and clothing were found under a mattress, behind a dumpster, in a nearby apartment complex. Appellant lived in that complex.

In October 2011, as she prepared to move to a new home, the mother

found the victim's diary. An entry in the diary named "Marshae" and "Jermaine" as the individuals who attempted to rape the victim. The mother turned the diary over to police, and appellant, who was in jail at the time for burglary, was interviewed by detectives on two separate occasions.

During the interviews, appellant made statements implicating himself in both the attempted rape and murder cases: He said the rape was Robinson's idea; he stood at the front door while Robinson and the victim fought inside the abandoned house. Concerning the murder, appellant said that he saw the victim the night before she went missing; that she was walking along a trail, which led from his apartment complex to her subdivision; that he put his arm around her and she "fell limp;" and that she did not have a pulse, so he covered her with a mattress. Furthermore, he admitted that he found deep scratch marks on his arm when he awoke the next morning.

The evidence was sufficient to enable any rational trier of fact to find appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307(99 SCt 2781, 61 LE2d 560) (1979); Morgan v. State, 290 Ga. 788, 790 (725 SE2d 255) (2012).

2. Appellant asserts the trial court erred in joining the two indictments for

trial.  We disagree.

In <u>Dingler v. State</u>, 233 Ga. 462 (211 SE2d 752) (1975), the Court of Appeals asked [pursuant to a certified question] whether severance is mandatory upon motion of defendant when two or more crimes of the same general nature are committed against different persons, at different times and places, and are charged in separate counts of an indictment. This Court answered affirmatively, noting that the right of severance where the offenses are joined solely on the ground that they are of the same or similar character is because of the great risk of prejudice from a joint disposition of unrelated charges.  In so doing, this Court adopted the ABA Standards on Joinder of Offenses which provide:

Whenever two or more offenses have been joined for trial solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses.  The court, on application of the prosecuting attorney, or on application of the defendant other than under subsection (a), should grant a severance of offenses whenever: (I) if before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or (ii) if during trial upon consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.  The court should consider whether in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

Under these Standards, a trial court must first determine whether the offenses are joined solely because they are of the same or similar character. If they are, severance is mandatory. If they are not, the court must then decide whether severance would promote a just determination of guilt or innocence as to each offense.

5

Stewart v. State, 277 Ga. 138, 138-139 (587 SE2d 602) (2003) (punctuation and citations omitted).

Inasmuch as the offenses were not joined solely because they were of the same or similar character, severance was not mandatory, and it was incumbent upon the trial court to determine whether severance was necessary to achieve a fair determination of appellant's guilt or innocence as to each offense. Id. The trial court determined both pre-trial and, more explicitly, post-trial, that the jury would be able to distinguish the evidence and apply the law intelligently to each offense. See Green v. State, 279 Ga. 455, 457 (614 SE2d 751) (2005) (permitting post-trial Stewart analysis of denial of severance). Given the disparate nature of the offenses and the fact that they occurred months apart, it cannot be said the trial court abused its discretion in making its determination. See id. See also Phillips v. State, 238 Ga. 616, 618 (5) 234 SE2d 527 (1977).

3. Appellant contends that the trial court erred by admitting his custodial statements into evidence. As noted above, appellant was interviewed on two separate occasions. The first interview took place on October 20, 2011; the second interview occurred the next day. Before each interview, Detective Ashley Melvin informed appellant of his Miranda rights. Using a printed form,

the detective read appellant his rights, one at a time. It was Detective Melvin's practice to have a suspect initial each of the rights on the form to signify he understood them. Appellant initialed each of the rights on the form; furthermore, he signed and dated the form as a whole. The detective testified that appellant did not ask any questions about his rights and did not appear to be confused or to have any trouble understanding them. He added that appellant said he would not be talking with him if he did not want to do so.

Appellant argues that the statements he made during the custodial interviews were inadmissible because they were not made knowingly and voluntarily. In this regard, appellant relies upon the expert opinion of Dr. Bruce Frumkin, a forensic psychologist, who testified on appellant's behalf at a *Jackson-Denno*[3] hearing.

Dr. Frumkin met with appellant for more than five hours and administered a battery of psychological tests to him. He concluded that appellant had an IQ of 98 (near average) and a verbal comprehensive score of 91 (lower 27 percentile), and that compared to other criminal defendants these scores would *not* indicate that he was "at risk for not understanding Miranda rights or not

---

[3] Jackson v. Denno, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

being able to appreciate his Miranda rights." Nonetheless, Dr. Frumkin, whose specialties include competency to waive Miranda rights, opined that although appellant knew he had a right to an attorney in the abstract, he was confused about that right because he had "just finished his burglary charge" and "had just seen his public defender," when he was interviewed by Detective Melvin. In addition, Dr. Frumkin said appellant did not understand what it meant when he was informed that he could exercise his Miranda rights at any time.

Appellant testified at the *Jackson-Denno* hearing and admitted: (1) that he did not have any questions while Detective Melvin read the Miranda rights form to him; (2) that Detective Melvin read these words to him at the end of the form: "I've been advised of my rights and I understand each of those rights;" and (3) that he signed the form. When asked if he actually understood his rights, appellant answered, "I would say yes, but I was still confused on the part about the attorney."

After weighing the evidence presented at the *Jackson-Denno* hearing, the trial court determined appellant was advised of his rights, understood them, and waived them voluntarily. See generally Currier v. State, 294 Ga. 392, 398 (754 SE2d 17) (2014) (burden is on the State to prove the voluntariness of a

8

confession by preponderance of the evidence). Because these findings are not clearly erroneous, they will not be disturbed on appeal. See Wright v. State, 285 Ga. 428, 431 (677 SE2d 82) (2009) (appellate court will not interfere with trial court's factual and credibility determinations following a *Jackson-Denno* hearing unless they are clearly erroneous).[4] See also Barrett v. State, 289 Ga. 197, 199 (709 SE2d 816) (2011) ("the fact that a defendant is of below average intelligence or even has moderate mental retardation does not, in and of itself, warrant the exclusion of defendant's inculpatory statement; there must be additional and sufficient evidence that the defendant did not have the capacity to understand and knowingly waive his Miranda rights").

4. Appellant claims the trial court erred in admitting the victim's diary entries into evidence. We disagree.

The trial court admitted the evidence under the doctrine of forfeiture by wrongdoing. This doctrine holds that "one who obtains the absence of a witness

---

[4] We note, in passing, that the jury heard an audio recording of appellant's first interview, watched a video recording of his second interview, and heard Dr. Frumkin testify on appellant's behalf. Moreover, the trial court charged the jury that it could not consider appellant's custodial statements until it determined he made them voluntarily after being advised of his constitutional rights. Thus, the jury "was able to see for itself the circumstances under which [appellant] made [his] statements," Wright, supra at 432, and reach its own conclusions as to whether appellant's statements were voluntary.

by wrongdoing forfeits the right to confrontation." Davis v. Washington, 547 U.S. 813, 833 (126 SCt 2266, 165 LE2d 224) (2006). It has been codified in Georgia's new Evidence Code as OCGA § 24-8-804 (b) (5), which provides: "The following shall not be excluded by the hearsay rule if the declarant is unavailable as a witness: A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

The trial court found by a preponderance of the evidence that appellant killed the victim "to make her unavailable as a witness." See United States v. Zlatogur, 271 F3d 1025, 1028-1029 (11th Cir. 2001); Brittain v. State, 329 Ga. App. 689, 693-697 (766 SE2d 106) (2014). Because the evidence was sufficient to satisfy the preponderance of the evidence standard, we find no error. See generally OCGA § 24-1-104 (a) ("Preliminary questions shall be resolved by a preponderance of the evidence standard.")

Relying upon OCGA § 24-8-807, appellant asserts that it was incumbent upon the trial court to find that the diary entry was more probative on the point for which it was offered than other evidence the State was able to procure. We disagree. By its own terms, OCGA § 24-8-807 does not apply to evidence

10

which is admissible under another exception to the hearsay rule.   See also Bradshaw v. State, 296 Ga. 650, 657 (769 SE2d 892) (2015) (when evidence is admissible for one purpose, we need not decide whether it is admissible for another).

5.  Finally, appellant contends the trial court erred in its instruction to the jury on battery.  Specifically, the trial court charged the jury that a person commits the offense of battery "when he or she intentionally causes substantial physical harm" and a person commits the offense of battery "when that person intentionally causes visible bodily harm to another."  Appellant contends this was error because these definitions were used to describe both battery and involuntary manslaughter (as a lesser included offense of felony murder), which confused the jury.  However, because the battery and involuntary manslaughter convictions were merged and vacated by operation of law, see fn. 1, supra, this issue is moot.  See Ford v. State, 298 Ga. 560, 565 (783 SE2d 906) (2016).

Judgment affirmed.  All the Justices concur.