**FIRST DIVISION
BARNES, P. J.,
MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 28, 2019**

# In the Court of Appeals of Georgia

A19A0123. SLOAN v. THE STATE.

BROWN, Judge.

Everett Sloan appeals from his convictions of armed robbery, aggravated assault, and boarding a bus with a weapon. He contends that the trial court erred in admitting other act evidence and by joining two indictments involving separate incidents for trial. He also asserts that his trial counsel provided ineffective assistance by failing to use an available peremptory strike to dismiss a juror. For the reasons explained below, we find that the trial court should not have admitted evidence of two prior robberies and reverse his convictions.

The record shows that the trial court granted the State's motion to try the indictments together, over Sloan's objection. In Case No. 14CR1656, the State indicted Sloan for armed robbery of a person waiting at a MARTA bus stop based

upon his alleged conduct on September 2, 2011. In Case No. 14CR1633-5, the State charged Sloan with boarding a MARTA bus with a concealed knife, as well as the armed robbery and aggravated assault of a bus driver based upon his alleged conduct on September 6, 2011. The trial court also admitted evidence of Sloan's previous guilty plea to robberies that took place in 2000 and 2005. The jury found Sloan guilty of the September 6, 2011 charges relating to the bus driver, but was unable to reach a unanimous verdict with regard to the September 2, 2011 charges involving the bus-stop victim.

*The September 2, 2011 Robbery at the Bus Stop.* The State presented evidence showing that the victim was working at a Church's Chicken on Gresham Road when a man came in around an hour before the store closed stating that he was looking for a job. After learning that they were not hiring, the man persuaded the victim and her manager to give him something to eat for free. He then left when the store closed at 10:00 p.m., and the victim walked for approximately ten minutes to a bus stop after she finished working around 10:45 p.m. As she waited for "[t]he number 9, Tony Valley" bus around 11:00 p.m., the same man approached and waited with her. After asking and learning that the bus was not yet due to arrive, the man held a knife with a silver blade against her stomach and said, "Bitch, give me your bag." When she

asked if he was serious because she had just fed him, he repeated the same words verbatim. After she gave him the bag, he told her to run, and she "ran toward Walmart." She called 911, but her phone went dead, and she did not "know if they picked up the address or not." The victim's daughter took her home, and she did not call the police again. The victim explained that she did not do so because she was afraid, apparently because the man knew where she worked, and it could have been worse. Subsequent police investigation did not reveal any record of her 911 call, and the police did not learn about the robbery until 12 days later.

*The September 6, 2011 Robbery of the Bus Driver.* The victim in this case testified that she was driving her last "in-bound trip" for the "Route 9, Tony Valley" bus when she stopped at a location not far from the Walmart on Gresham Road some time after 11:23 p.m. because a man was waiting for the bus. The man boarded the bus, tapped a Breeze card to pay his fare, and sat down in the third seat, which was closer to the rear door than the front door. He was the last person to tap a Breeze card for her shift, and the only person on the bus. The man made conversation with the bus driver, and she testified that he stated that he attended the Everest Institute and was

3

majoring in heating and air conditioning.[1] At one point in their conversation, he asked if this was the last bus, and she stated only that she thought so, even though she knew that it was the last bus. After some additional conversation, he asked her to stop at the next stop. As he exited the bus, "he stopped at the door and turned and just jumped on [the bus driver]." While he grabbed her by the neck and demanded her purse, she tried to feel for the emergency brake because the bus was rolling. When the bus jerked to a stop, she was able to unhook her seatbelt, stand up, and attempt to escape. As they kicked and punched one another, he kept demanding money, and she kept telling him she did not have a purse. After commenting that the bus driver was strong, the man pulled out a knife and stabbed her in the arm. She testified that when he "goes over to the seat of the bus and he's looking," she hit an emergency button with a microphone every chance she could while screaming for help and hitting the horn of the bus. The man warned "don't make me kill you" and stabbed her a total of three times. At some point, another bus arrived, and the man left. After he left, the bus driver realized her watch was missing along with a "pouch" containing her MARTA identification, driver's license, credit card, and $10 cash.

---

[1] In a recorded statement given to MARTA police hours after the incident, the bus driver stated that the man said he was studying to become an electrician.

The bus driver testified that her bus had a mirror that allowed her to look back at the seated man while she was speaking with him "[e]very now and then . . . [b]ut not long." She testified that she was able to observe him for "[a]bout five[,] ten, twenty minutes"; she acknowledged that she is trained to focus on the road while driving the bus. She testified that she remembered nothing distinctive about the man's voice, and she was not sure whether he had facial hair.[2] At one point, she was "face-to-face" with him, and she explained that she got her best look at him while she was fighting with him. At trial, she described the knife used by her attacker as a kitchen or steak knife with a black handle.[3]

_____

[2] In a recorded interview with a MARTA police detective within hours of her assault, the bus driver stated that she did not notice whether he had facial hair. Surveillance footage of Sloan taken approximately six hours before the assault shows that he had a readily observable mustache and goatee.

[3] When asked to describe the knife used by her attacker in the recorded interview given to a MARTA police detective within hours of her assault, the bus driver described it as a kitchen knife and made no mention of it having a black handle. MARTA police searched Sloan's home on September 8, 2011, and the search warrant listed a "silver edged knife" as an item to be seized. They found and photographed a box of kitchen knives with black handles during their search, but they were not taken into evidence.

A different MARTA police detective testified that she thought the bus driver told her that the knife had a black handle at the time she provided a September 19, 2011 written statement. When defense counsel cross-examined her with the fact that the bus driver's written statement did not specify that the knife used by her attacker had a black handle, the detective testified that she believed the bus driver already had

5

The State presented evidence showing that the same Breeze card used by the last passenger to board the MARTA bus was used earlier that day at a train station with closed-circuit video cameras. Images from the train station showed a man wearing a green and black shirt exiting the train at 12:18 p.m., around the same time the Breeze card was used, and the same person again at 5:24 p.m., wearing the same shirt. From these images, a MARTA police officer created a still-image BOLO and sent it to all MARTA personnel. This officer testified that "[t]he uniform at Everest Institute . . . they wear a green and black shirt." In a statement provided to police, the bus driver described the man as wearing a "white shirt." While the Breeze card was used again the day after the assault and robbery of the bus driver, the State did not present surveillance video depicting who used the card on that day, and the officer who reviewed the surveillance video to create the BOLO testified that reviewing footage for the day after the robbery and assault "was not a part of my assignment."

It is undisputed that there is no video of the passenger boarding the MARTA bus with the same card, and no method for MARTA to determine from its Breeze card records the identity of the person who used the card to board the bus. Sloan presented

provided that information to the other detective who had recorded the interview of the bus driver. As outlined above, the bus driver made no mention of a black handle in her recorded interview.

6

evidence showing that the Breeze card at issue could only be used for 30 days, and that the same card was used 23 times on September 14, 2011, between 7:22 a.m. and 6:12 p.m., the same day Sloan was arrested and placed in custody around 2:00 p.m.

The former director of the Everest Institute on Wesley Chapel Road testified that Sloan was enrolled in its "heating ventilation and air conditioning" program and that students in this program wore green and black shirts. When the police came to the school on September 7, 2011, the director identified Sloan as the person in the BOLO created by MARTA police. He provided the police with an orientation picture of Sloan and informed the police that the school sold discounted Breeze cards to its students.

A MARTA detective created a photographic lineup, and the bus driver identified Sloan as her attacker both in the line-up and at trial. She testified at trial that she was sure she had identified the right person "[b]ecause I will never forget those eyes."[4] The detective who showed the photographic lineup to the bus driver testified that he recorded his interaction with her at the time of the lineup, and the purpose of such a recording is to ensure that an officer does not accidentally influence

_____

[4] In a recorded interview with police that took place within hours of the assault, the bus driver was asked to describe the man, and she stated that "she can't even remember if he had any facial feature – I know if I seen him."

a witness into picking a particular person. He acknowledged that he knew Sloan was a suspect when he placed his picture in the lineup and that it is a better police practice for an officer *not* to know who the suspect is in a photographic lineup when showing it to an eyewitness. He was also aware that this was a high-profile case "all over the news." The bus driver testified that the lineup was not recorded, and no recording of the lineup was introduced or played for the jury at trial. All of the men in the photographic lineup had goatees or beards.

The police attempted to arrest Sloan at his residence, but he was not at home. A search of his home revealed an Everest Institute shirt in the same bedroom as a box of knives with black handles. The State presented no evidence showing that they recovered the Breeze card or any items taken from either of the victims.

On September 14, 2011, police located Sloan "off of Gresham Road near his home." A marshal saw him crossing the street from the Church's Chicken to a laundromat, and he was taken into custody. After Sloan was already in handcuffs, the bus-stop robbery victim approached "kind of upset stating, 'hey, that guy robbed me.'" She testified at trial that she saw him walking past the Church's Chicken and "took a double look and . . . realized it was him" right before he was arrested. In an interview with a police detective, the bus-stop robbery victim "stated that while she

8

was working, someone came up into the restaurant and said that they thought that the person that robbed her was across the street." During cross-examination, defense counsel established that this person was not present during the robbery.

*The November 7, 2000 Armed Robbery of Church's Chicken on Gresham Road.* The State presented evidence showing that Sloan and another man robbed the restaurant after 8:00 p.m. by pointing a gun, ordering everyone to the floor, and instructing an employee to open the cash drawer. Both men were wearing black masks over their faces, and it was clear from the moment they entered the store that they intended to commit a robbery. Sloan subsequently pled guilty to robbery, reduced from the armed robbery charged in an indictment against him, and he was sentenced to serve four years in prison.

*The July 19, 2005 Robbery of Family Dollar*. The State presented evidence showing that Sloan robbed a store while wearing panty hose over his face. As he was exiting the store, he brandished a knife at a customer who was entering the store.

1. Sloan contends that the trial court erred by joining the two indictments together for trial. We disagree.

In *Dingler v. State*, 233 Ga. 462 (211 SE2d 752) (1975), the Supreme Court of Georgia adopted the ABA Standards on Joinder of Offenses. Id. at 463. Under these standards,

> [t]wo or more offenses may be joined in one charge, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both: (a) are of the same or similar character, even if not part of a single scheme or plan; or (b) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

(Citations and punctuation omitted.) Id. at 463. But, when "multiple offenses have been joined *solely* on the ground that they are of the same or similar character, the defendant has an *absolute* right to a severance of the offenses." (Emphases supplied.) *Terry v. State*, 259 Ga. 165, 168 (1) (377 SE2d 837) (1989). On the other hand,

> where two or more offenses are joined on grounds that they are of the same or similar character, *and* are part of a single scheme or plan, *or* are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, the trial court, in its discretion, should grant a severance of offenses if it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each charge.

(Emphases supplied.) Id.

10

In exercising its discretion when severance is not mandatory, "[t]he court should consider whether in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." (Citation and punctuation omitted.) *Hickman v. State*, 299 Ga. 267, 269 (2) (787 SE2d 700) (2016). We review a trial court's decision on joinder of offenses for an abuse of discretion. Id. at 270 (2).

(a) Based upon the above, we will first determine whether the charges were joined solely on the ground that they were of the same or similar character (severance mandatory) or based upon a series of acts constituting parts of a single scheme or plan (severance discretionary). "A pattern justifying the joinder of offenses for trial exists where several similar offenses are closely connected by geography, time, and manner so as to constitute a scheme or plan of criminal conduct." (Citation and punctuation omitted.) *Grant v. State*, 289 Ga. App. 230, 232 (1) (656 SE2d 873) (2008).

In this case, the offenses show a common plan to target a particular MARTA bus route for the purpose of demanding a victim's purse at knife point. Both events took place late at night during the last bus runs of the evening, and were perpetrated against solitary female victims. Based upon these particular facts and circumstances,

11

we cannot say that the offenses were joined *solely* because they are of the same or similar character. See *Dailey v. State*, 271 Ga. App. 492, 495 (2) (610 SE2d 126) (2005) (trial court did not err by denying motion to sever two armed robberies that took place six weeks apart in a manner demonstrating a common plan or scheme); *Williams v. State*, 269 Ga. App. 673, 675-676 (2) (605 SE2d 83) (2004) (affirming joinder of robberies occurring in one month in same geographic area that were committed in similar manner). Thus, severance was discretionary rather than mandatory.

The Supreme Court of Georgia's opinion in *Thompson v. State*, 302 Ga. 533, 541 (III) (A) (807 SE2d 899) (2017), relied upon by Sloan on appeal, does not mandate a contrary conclusion. In that case, the Supreme Court of Georgia addressed whether a subsequent attempted armed robbery of person in a car, committed three and a half years after the charged offenses, could be admitted in a case charging the defendant with the murder of victims shot in their home during an apparent robbery. Id. at 534 (I), 537 (III), n.7. With regard to plan as a purpose for which the crime could be admitted as other act evidence, the Supreme Court of Georgia concluded that "the attempted armed robbery shows, if anything, merely a propensity to commit robbery, and not a common scheme or plan to commit robberies in a certain way." Id.

12

at 541 (III) (A). As we already have pointed out, the two joined offenses in this case do show a common plan to commit robberies in a certain way, and the Supreme Court of Georgia's opinion in *Thompson* is therefore distinguishable for this reason, as well as the fact that it was not addressing the standard for joinder of offenses.

(b) Having concluded that severance was not mandatory, we now determine whether the trial court should have exercised its discretion to sever the offenses "to promote a fair determination of the defendant's guilt or innocence of each charge." *Terry*, 259 Ga. at 168 (1). In this case, only two incidents were involved, and a trier of fact could easily parse the evidence and law with regard to each charge. Indeed, the jury's ability to agree on a verdict for the charges in one indictment, but not the other, demonstrates its ability to separately consider the evidence. Under the particular facts and circumstances of this case, we cannot say that this alternative ground for severance mandates the conclusion that the trial court abused its discretion by allowing the joinder of the two indictments. See *Hickman*, 299 Ga. at 270 (2).

2. Sloan contends that the trial court erred by admitting evidence of the 2000 and 2005 armed robberies because they were not relevant to show identity and any probative value of the evidence was substantially outweighed by the danger of undue prejudice. For the reasons explained below, we agree.

13

A party seeking to admit other act evidence pursuant to

> OCGA § 24-4-404 (b) must show three things: (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

(Punctuation omitted.) *Kirby v. State*, 304 Ga. 472, 484 (4) (819 SE2d 468) (2018). OCGA § 24-4-404 (b) provides that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible for other purposes, including to prove intent, identity, opportunity, and preparation. The record shows that the trial court admitted the other act evidence in this case for the purpose of showing identity, opportunity, preparation, and intent and instructed the jury that it could consider the evidence of other crimes for all of these purposes both at the time the evidence was admitted and at the close of the evidence. While we agree with the State that the prior robberies qualify as relevant for the purpose of intent, they were *not* relevant for the purpose of showing identity, opportunity, or preparation.

(a) *Identity*. Other act evidence offered for the purpose of showing identity "must be so similar as to demonstrate that the other act and the charged offense were 'signature crimes,' with the defendant using 'a modus operandi that is uniquely his.'" (Punctuation omitted.) *Kirby*, 304 Ga. at 484 (4) (a) (i).

> A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies, or rapes.

(Citation and punctuation omitted.) *Amey v. State*, 331 Ga. App. 244, 249-250 (1) (a) (770 SE2d 321) (2015). For example, in *United States v. Clemons*, 32 F3d 1504 (11th Cir. 1994), the Eleventh Circuit allowed other act evidence for the purpose of proving identity when the defendant

> cruised shopping centers accompanied by one or two companions looking for high-performance sports cars to steal. In each case, a gun was used to wrest the car from its occupant, and in each case the stolen vehicle was deposited in the same neighborhood. The manner and method of carjacking employed by [the defendant] in each incident manifested a distinctive modus operandi. The only feature of [the] last carjacking offense distinguishing it from the previous acts was that it resulted in a murder.

15

Id. at 1509 (III).

In this case, as in *Amey*, we cannot say that Sloan's prior robberies were "so similar to the charged offense[s] that the charged offense[s] must have been his handiwork." Id. at 250 (1) (a). Accordingly, the trial court erred by admitting evidence regarding the 2000 and 2005 robberies for this purpose. Id. at 252-253 (1) (c). See also *Brooks v. State*, 298 Ga. 722, 725-726 (2) (783 SE2d 895) (2016) (holding prior murder not admissible even though it "bore some similarities" to the murder being tried because "the modus operandi for each murder was relatively commonplace — these were not signature crimes").

(b) *Opportunity*. Admission of evidence for the purpose of showing opportunity is "probably the most rarely used purpose of those listed in Rule 404 (b). It admits evidence that relates to the defendant's *specific* ability or wherewithal to commit the crime charged." (Citation and punctuation omitted; emphasis in original.) *Amey*, 331 Ga. App. at 252 (1) (c). While there are few cases specifically addressing the circumstances under which opportunity may be a proper purpose for admitting other act evidence, a sister court has recognized "it as evidence tending to establish opportunity, in the sense of access to or presence at the scene of the crime or in the sense of possessing distinctive or unusual skills or abilities employed in the

16

commission of the crime charged." (Citation and punctuation omitted.) *Emory v. State*, 101 Md. App. 585, 618 (10) (647 A2d 1243) (1994).

Here, no special skills or abilities were used during the commission of the crimes, and the State presented no evidence showing where Sloan lived at the time of the 2000 and 2005 armed robberies. *Amey*, 331 Ga. App. at 252 (1) (c) (rejecting State's argument that close proximity of defendant's residence to location of charged offense standing alone authorized proof of prior crimes to show opportunity). The trial court therefore erred by admitting the other act evidence for the purpose of proving Sloan's opportunity to commit the charged offenses.

(c) *Preparation*. Although there is a dearth of Georgia decisions specifically addressing the admission of other act evidence for the purpose of showing preparation, federal decisions addressing this component of Federal Rule of Evidence 404 (b) provide guidance. See *Amey*, 331 Ga. App. at 247-248 (1). These decisions show that "acts in preparation leading up to the charged offense . . . may be admitted under Rule 404 (b)." Paul S. Milich, Georgia Rules of Evidence, § 11:16 at 338 (2018-2019 ed.). Examples of other act evidence admitted to show preparation

17

include the theft of weapons used in subsequent robberies[5] and a visit to a nearby bank the day before the charged robbery of the only other bank in a small city.[6] As the other act evidence in this case did not show preparation, the trial court should not have admitted the other robberies based upon this ground.

(d) *Intent*. "Evidence that tends to prove Appellant's intent in this case could be relevant because he put his intent at issue by pleading not guilty, and he did not take any affirmative steps to relieve the State of its burden to prove intent." *Kirby*, 304 Ga. at 480 (4) (a). Our analysis does not end here, however, as we must also review the trial court's application of the Rule 403 balancing test. Id. at 481 (4) (a).

(e) *Rule 403 Balancing Test*. "The Rule 403 analysis must be done on a case-by-case basis and requires a common sense assessment of all the circumstances surrounding the extrinsic act and the charged offense." *Castillo-Velasquez v. State*, 305 Ga. 644, 648 (2) (827 SE2d 257) (2019). Rule 403 is an extraordinary exception to the inclusivity of other act evidence under Rule 404 (b). *West v. State*, 305 Ga. 467, 474 (2) (826 SE2d 64) (2019). A trial court's decision to admit other act evidence

---

[5] *United States v. Duran*, 563 Fed. Appx. 174, 178-179 (III) (A) (3rd Cir. 2014).

[6] *United States v. Smith*, 264 Fed. Appx. 730, 732-733 (II) (A) (10th Cir. 2008).

under OCGA § 24-4-404 (b) will be overturned only where this is a clear abuse of discretion. *Kirby*, 304 Ga. at 479 (4). Finally, "in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) *Strother v. State*, Ga. (4) (d) (Case No. S19A0279, decided May 20, 2019).

(i) *Probative Value.* "In considering the probative value of evidence offered to prove intent, these circumstances include the prosecutorial need for the extrinsic evidence, the overall similarity between the extrinsic act and the charged offense, and the temporal remoteness of the other act." *Kirby*, 304 Ga. at 481 (4) (a). "When reviewing whether a trial court has abused its discretion in its application of the balancing test in OCGA § 24-4-403, it is important to bear in mind the distinction between relevance and probative value." *Dixon v. State*, 341 Ga. App. 255, 261 (1) (b) (800 SE2d 11) (2017).

> Relevance and probative value are related, but distinct, concepts. Relevance is a binary concept — evidence is relevant or it is not — but probative value is relative. Evidence is relevant if it has "any tendency" to prove or disprove a fact, whereas the probative value of evidence derives in large part from the extent to which the evidence tends to make the existence of a fact more or less probable. Generally speaking, the

greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered. Probative value also depends on the marginal worth of the evidence — how much it adds, in other words, to the other proof available to establish the fact for which it is offered. The stronger the other proof, the less the marginal value of the evidence in question. And probative value depends as well upon the need for the evidence. When the fact for which the evidence is offered is undisputed or not reasonably susceptible of dispute, the less the probative value of the evidence.

(Citations and footnotes omitted; emphasis omitted.) *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016).

In evaluating the prosecutorial need for the other act evidence to show intent, we should examine the "danger that a rational jury could find that although the defendant committed the objective, charged acts, he did not intend to do so[.]" (Citation omitted.) *Chynoweth v. State*, 331 Ga. App. 123, 128 (3) (768 SE2d 536) (2015).

The classic situations calling for admissibility of independent crimes or acts to prove intent are when the defendant admits a certain involvement in the criminal incident but maintains he was duped or forced to go

20

along and thus lacked the necessary criminal intent or the defendant admits the charged conduct but claims he did not intend to act criminally.

Milich, § 11:15 at 330. See also *Castillo-Velasquez*, 305 Ga. at 649 (2) (defendant "squarely placed his intent at issue by claiming at trial that his delusions completely negated his criminal intent"); *Logan-Goodlaw v. State*, 331 Ga. App. 671, 675 (2) (770 SE2d 899) (2015) (theory that defendant "was present during the underlying robbery, but had not participated in robbing the victim squarely challenges the element of intent") (citation and punctuation omitted). In this case, the prosecutorial need for the other act evidence was minimal, as it is unlikely, based upon the particular facts and circumstances of this case, that any rational jury could find that the perpetrator lacked criminal intent when he committed both of the charged robberies.

With regard to the other two factors considered when examining the probative value of evidence offered for the purpose of showing intent (similarity and temporal remoteness), the record shows that the other act crimes were not similar in the manner in which they were committed, although one took place at the same Church's Chicken where the bus-stop victim worked. While the time gap between the offenses spans

21

many years, we must take into account that "it is likely that he was incarcerated for a significant portion of the intervening years."[7] *Kirby*, 304 Ga. at 484 (4) (a) (i) ("prior crime need not be very recent, especially where a substantial portion of the gap in time occurred while the defendant was incarcerated") (citation and punctuation omitted). While the 2000 and 2005 crimes "were not so remote as to be lacking in evidentiary value," id. at 484 (4), "this temporal proximity alone does not make [them] more appreciably probative." Id. at 486 (4) (a) (ii). Having considered the particular facts and circumstances of this case, we conclude that the probative value of the other robberies is "quite low." Id. at 486 (4) (a) (ii).

(ii) *Prejudicial Effect*. The "major function of OCGA § 24-4-403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. . . ." (Citation and punctuation omitted.) *Kirby*, 304 Ga. at 480 (4). In our view, the trial court committed a clear abuse of discretion by failing to conclude that the probative value of the other act evidence in this case was outweighed by its prejudicial impact suggesting that Sloan was a serial robber. While

---

[7] In December 2001, Sloan was sentenced to serve four years in prison in connection with the 2000 armed robbery. In July 2005, he committed another armed robbery, pled guilty, and was sentenced in February 2006 to serve seven years in prison with credit for 224 days. The record before us does not show the amount of actual time served by Sloan for either offense.

22

the prejudicial impact of such evidence may be reduced by a trial court's limiting instruction,[8] in this case, the trial court instructed the jury that the other act evidence could be used for the improper purposes of identity, opportunity, and preparation. Accordingly, "the limiting instruction's effect on the evidence's prejudicial effect is irrelevant to the propriety of its admission." *United States v. Baker*, 432 F3d 1189, 1208 (II) (A) (2) (a), n.14 (11th Cir. 2005) (holding district court committed reversible error by admitting other act evidence for an improper purpose).

(f) *Harm.* We must now determine whether Sloan is entitled to a new trial based upon the trial court's error in admitting the 2000 and 2005 robberies.

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so.

(Citations and punctuation omitted.) *Kirby*, 304 Ga. at 478 (3) (c). "Where evidentiary error is deemed harmless, it is often true that the evidence was only 'marginal' to the prosecution's case. [Cit.]" *Thompson v. State*, 302 Ga. 533, 542 (III) (A) (807 SE2d 899) (2017).

---

[8] See *McCoy v. State*, 332 Ga. App. 626, 629 (774 SE2d 179) (2015).

In this case, the jury could not agree to convict Sloan for the bus stop robbery, and the case involving the robbery of the bus driver hinged on her opportunity to view and identify him as the person using the same Breeze card Sloan had used earlier in the day. As we have previously pointed out, the bus driver could only glance up at him in the rear view mirror while she drove the bus. While she saw him "face-to-face" during the attack, she did not know that he had a mustache and goatee. Additionally, there were inconsistencies between her trial testimony and the statement she gave to the MARTA police shortly after the assault and robbery, and her later testimony was consistent with information obtained during the MARTA police investigation (black handle on the knife and studying HVAC). Finally, the jury was improperly charged that the prior robberies could be used for the purpose of identity, and "the prosecution emphasized in closing that [Sloan] had a history of armed robbery — precisely the kind of propensity argument that Rule 404 (b) is designed to guard against." *Thompson*, 302 Ga. at 542 (III) (A). While the evidence was sufficient to convict Sloan of charges stemming from the robbery of the bus driver and he may be retried,[9] "we cannot say that it is so overwhelming, or that the

---

[9] See *Maqrouf v. State*, 349 Ga. App. 174, 180 (1) (b) (825 SE2d 569) (2019).

improper character evidence was so marginal, that the jury's verdict was not likely to be impacted." Id. We therefore reverse Sloan's convictions.

3. In his remaining enumeration of error, Sloan contends that trial counsel provided ineffective assistance of counsel during jury selection. Our holding in Division 2 renders this claim of error moot.

*Judgment reversed. Barnes, P. J., and Mercier, J., concur.*