

**SUPREME COURT OF GEORGIA**

Atlanta          November 2, 2017

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

It appearing that the enclosed opinion decides a second-term appeal, which must be concluded by the end of the August Term on November 18, 2017, it is ordered that a motion for reconsideration, if any, including any motions submitted via the Court's electronic filing system, must be <u>**received**</u> **in the Clerk's Office by 10:00 a.m. on Thursday, November 9, 2017.**

SUPREME COURT OF THE STATE OF GEORGIA

Clerk 's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

*Thrisa S. Baumne*, Clerk

In the Supreme Court of Georgia

Decided: November 2, 2017

S17A0935. THOMPSON v. THE STATE.

GRANT, Justice.

A Fulton County jury found appellant Eric Thompson guilty of two counts of malice murder in connection with the deaths of Andre Geddis and Melody Keller.[1] On appeal, Thompson contends that the trial court erred by admitting certain evidence, including character evidence and hearsay evidence, and denying his motion for continuance. Thompson also challenges the sufficiency of the evidence supporting the guilty verdicts and alleges that his

---

[1] The crimes took place on May 15, 2008. Thompson was charged with two counts of malice murder, two counts of felony murder (predicated on armed robbery), two counts of armed robbery, two counts of aggravated assault, and one count of possession of a firearm during the commission of a felony. The jury returned guilty verdicts on all counts. Thompson received a life sentence for each of the malice murder counts and a five-year sentence for the possession of a firearm count. Although the trial court improperly merged Thompson's armed robbery convictions, we do not address that error in light of the reversal in Division III. Thompson filed a motion for new trial, which was amended with new counsel. Following a hearing, the trial court denied his motion on January 27, 2015. Thompson filed a timely notice of appeal, and the case was docketed in this Court to the April 2017 Term and submitted for a decision on the briefs.

trial counsel was ineffective for failing to object to a portion of the State's closing argument. We agree that some of the challenged character evidence was improperly admitted and that the admission was not harmless. We therefore reverse.

## I.

Police performing a welfare check found the bodies of Andre Geddis and his fiancée Melody Keller inside their home; someone wielding a .40 caliber gun had shot Geddis and Melody to death. Although there was no sign of forced entry, police suspected robbery because the victims' cars and electronic equipment were missing and the house was in disarray. Police recovered several shell casings and prescription pills from the home.

Police then canvassed the neighborhood surrounding the victims' home, but their efforts yielded little evidence. A few days later, one of the victims' cars, a white Chevy Malibu, was recovered. The second car, a Chevy Tahoe, was found in a different location a few days later. Both cars had been "stripped."

Lacking leads, the police obtained a court order for Geddis's cell phone records. As it turns out, Geddis had exchanged phone calls with Thompson's codefendant, Vincent Russell, on the day of the murders. Police were able to

2

determine Russell's phone number from a police report that Russell filed less than one month after the murders. Russell had reported his .40 caliber Smith & Wesson handgun as stolen and had included a phone number—which matched the phone number in Geddis's phone records—in the police report as his contact number. By examining Russell's phone records, police learned that Russell and Thompson[2] made phone calls to each other the same day Geddis and Melody were murdered.[3] Thompson's cell phone records revealed that on the night of the murders, his cell phone pinged off a tower near the victims' house around 9:00 p.m. Roughly a half-hour later, Thompson's phone repeatedly called Russell's phone. Notably, these calls from Thompson's phone to Russell's phone took place while Thompson's phone was located in the same area as the victims' home. Meanwhile, no outgoing calls were made from Geddis's phone after 9:25 p.m. that night. At 11:30 p.m., however, an incoming call to Geddis's phone went unanswered. At that point, Geddis's phone—which was never recovered after his killing—pinged off a cell tower

---

[2] Thompson was the registered subscriber for his cell phone.

[3] Testimony at trial established that Russell and Thompson knew each other prior to the murders. Russell's sister was dating Thompson prior to the crimes. Russell's former girlfriend testified that Thompson was the godfather to two of her three children and that Russell's sister was the godmother to those children.

located near Thompson's home, rather than a tower near Geddis's own home and the site of his murder.

A phone call between Geddis and Coey Keller, Melody's brother, sheds additional light on the timeline and events surrounding the murders. Geddis called Coey around the same time that Thompson's phone approached the victims' home. During the conversation, Geddis told Coey that he had arranged to purchase a .40 caliber gun. Though he did not mention any names, Geddis said he was waiting on someone to come over with the gun. Geddis and Melody were shot to death with a .40 caliber Smith & Wesson gun.

In addition to the cell phone evidence, the police developed a lead on a man named Ronnie Heath. Heath eventually pled guilty to voluntary manslaughter in connection with the murders after police learned that he stole a car from the victims' house on the night of the murders. In 2009, Heath gave two statements to police implicating Thompson as one of the people involved in Geddis and Melody's murders. At trial, Heath claimed that he had no memory of the night of the murders or of his prior statements to police.[4] But

---

[4] On the stand, Heath admitted that he had agreed to testify truthfully as part of his own plea agreement. But he also testified that he was dissatisfied with his plea deal. Heath claimed at trial that he did not participate in the murders and did not see anyone else participate in the murders.

Heath did testify that he had known Thompson for a long time. He denied that he had ever met or known Russell. The State impeached Heath with his 2009 statements to police and a copy of the transcripts of his statements were admitted into evidence. That night, according to Heath's 2009 statements, Thompson, along with two other men, recruited him to go to a house and "test drugs." When the group arrived at the victims' home, Heath and another man, who was dressed in a security guard uniform, got out of the car while Thompson and another associate stayed behind.[5] Thompson told Heath that the security guard had a gun. The security guard knocked on the door and a man who appeared to know the security guard let Heath and the security guard inside. Heath stayed at the front of the house until the security guard returned and gave him a set of keys to a white Chevrolet and told Heath to take the car and leave, which he did.[6] Heath took the white car back to Thompson's house where he, Thompson, and the other man who had ridden with them to Geddis's

[5] Russell testified at trial. He admitted that in 2008 he was working as a security guard for a club. Russell admitted that he and a friend went to Geddis's home one Friday night, and he witnessed Geddis giving "weed" to another person. Russell's girlfriend also testified that he was working as a security guard in 2008.

[6] During the 2009 statements, police asked Heath to draw a picture of the interior of the victims' home. Other witnesses at trial confirmed that Heath's picture accurately represented the interior of the victims' home.

home began taking certain items from the car (such as the radio and speakers). Melody's brother testified that she drove a white Chevy Malibu. Police officers later recovered Melody's abandoned car, which was missing its radio, wheels, rims, and other items.

## II.

Thompson contends that the trial court erred in denying his motion for a directed verdict of acquittal because the State presented insufficient evidence to convict Thompson of the charged crimes beyond a reasonable doubt. We disagree.

A directed verdict of acquittal should be entered where there is no conflict in the evidence and the evidence demands a verdict of acquittal with all reasonable deductions and inferences. OCGA § 17-9-1 (a). This Court applies the same standard of review to a denied motion for directed verdict as that which is used to determine the sufficiency of the evidence. *Kitchen v. State*, 287 Ga. 833, 834 (700 SE2d 563) (2010) (citing *Yat v. State*, 279 Ga. 611, 613 (619 SE2d 637) (2005)). That means that we apply the standard demanded by *Jackson v. Virginia*: Whether the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that

6

Thompson was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

The evidence as set out above is sufficient to support Thompson's convictions in this case. While Heath's 2009 statement to police did make up a significant portion of the testimony connecting Thompson to the murders, it was not the only evidence against Thompson. Cell phone evidence indicates Thompson was near the victims' home near the time the crimes took place. Direct testimony establishes that Thompson recruited at least one participant in the robbery scheme that resulted in the murders of Geddis and Melody. There is evidence that Thompson knew the security guard was carrying a gun when they drove to the victims' home for the robbery. Police recovered the victims' white Malibu near Thompson's home and the car was "stripped" in the manner described by Heath. And an unanswered call to Geddis's cell phone pinged off a tower near Thompson's house just a couple of hours after the murders took place. Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. *Edwards v. State*, 299 Ga. 20, 22 (785 SE2d 869) (2016). The evidence was sufficient to corroborate Heath's testimony under OCGA § 24-14-8. *Crawford v. State*, 294 Ga. 898, 901-902 (757 SE2d

7

102) (2014) (phone records that provide circumstantial evidence of the crimes sufficient to corroborate accomplice testimony). The evidence presented was also constitutionally sufficient for the jury to find Thompson guilty with respect to these charges. *Jones v. State*, 299 Ga. 377, 379 (788 SE2d 477) (2016).

## III.

Thompson contends that the trial court erred by admitting character evidence alleging that Thompson had participated in an attempted armed robbery three and a half years after the murders and that he was a drug dealer who had purchased an assault rifle.[7] We agree that the trial court abused its discretion by admitting the evidence of the subsequent attempted armed robbery. And we cannot say that the evidence of guilt was such that "there is no reasonable probability that the verdicts of the jury would have been different in the absence of such error." *Nichols v. State*, 282 Ga. 401, 405 (651 SE2d

---

[7] At trial, and over Thompson's objection, the State called Darious Bell to testify about the attempted armed robbery of Jason Ward, an incident that occurred about three and a half years *after* the murders. Specifically, Bell was impeached with a prior statement in which he alleged that Thompson and some of his associates were supposed to rob Ward, but when Thompson and his partner approached Ward's car, Thompson's partner unexpectedly started shooting and Thompson fled without robbing Ward. Additionally, and again over Thompson's objection, the jury watched a video of Heath's prior police interview in which he claimed that Thompson was a drug dealer and had purchased a rifle from Russell.

15) (2007). On the other hand, we conclude that the trial court did not abuse its discretion in admitting the evidence of Thompson's drug activities or the evidence that Thompson purchased a firearm from his codefendant Russell. We address each contention more fully below.

A. *Other Acts Evidence*: *Subsequent Armed Robbery.* Thompson's case straddles the divide between Georgia's former Evidence Code and the date our current Evidence Code became effective, January 1, 2013. The hearing on the State's motion to admit evidence pursuant to Rule 404 (b) was held on February 29, 2012. During that hearing, the State posited that evidence of Thompson's participation in the subsequent armed robbery of Ward was admissible to show Thompson's motive, course of conduct, intent, and lack of mistake. The trial court entered a written order dated March 9, 2012, denying in part and granting in part the State's motion and determining that evidence of the subsequent attempted armed robbery of Ward was admissible for the purpose of showing motive, plan, course of conduct, and lack of mistake. Noticeably absent from that order is intent. The trial court's order notes the following similarities between the circumstances surrounding the murders and the attempted armed robbery of Ward: armed robbery of the victims; shots

fired; possession of a firearm by the assailants; groups of young men involved; occurrences in the same area; and occurrences close in time.

Before Thompson's April 2013 trial, the trial court revisited its order at Thompson's request. Thompson specifically asked the trial court to reconsider its ruling in light of the changes to our Evidence Code. Ruling from the bench and outside the presence of the jury, the trial court again determined that the evidence was admissible to show motive, plan, and lack of mistake. Although the trial court maintained that its original findings were correct, it conceded that, under the new Evidence Code, course of conduct was no longer a permissible purpose for other acts evidence. The trial court reiterated its findings that the State could show that Thompson committed the Ward attempted armed robbery, that there was sufficient similarity between the charged murder and the subsequent robbery, and that the probative value of the evidence outweighed its prejudicial effect. In sum, the trial court ruled that evidence of Thompson's involvement in the attempted armed robbery of Ward would be admissible to show motive, plan, and lack of mistake under our new Evidence Code at the time of Thompson's trial.

During Thompson's trial, the State offered testimony about the attempted armed robbery of Ward. Before that testimony was entered, the trial

court instructed the jury that it could consider the evidence for plan, motive, and to negate or disprove mistake. The jury was not instructed that it could consider the evidence for purposes of intent. In fact, Thompson's counsel objected to including an intent instruction because the trial court had not previously identified intent as a permissible purpose in its written order or in its ruling from the bench. The State agreed that intent would not be included in the jury instruction. At trial, the State's witness changed his story and denied that Thompson had been involved in the robbery.

The State proceeded to impeach its witness with a transcript of prior statements he made nine months earlier while pleading guilty to the attempted armed robbery. At the time of his plea, the witness had identified Thompson as one of the people involved in the attempted armed robbery. In addition to the witness's testimony and impeachment, the State presented a document showing that Thompson was indicted in connection with the attempted armed robbery of Ward and that Thompson pled guilty to charges including criminal attempt to commit armed robbery in connection with that crime. The trial court admitted a copy of the indictment and Thompson's plea agreement as exhibits.[8]

---

[8] The record reflects that Thompson, along with the State's witness and two other men, was indicted on charges stemming from the attempted armed robbery of Ward.

In evaluating the admission of this evidence, we start with the proposition that Rule 404 (b) is, on its face, "an evidentiary rule of inclusion which contains a non-exhaustive list of purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence." *State v. Jones*, 297 Ga. 156, 159 (773 SE2d 170) (2015) (citing *United States v. Jernigan*, 341 F3d 1273, 1280 (11th Cir. 2003)). Despite its inclusive nature, Rule 404 (b) "prohibits the admission of such evidence when it is offered *solely* for the impermissible purpose of showing a defendant's bad character or propensity to commit a crime." Id. (emphasis in original). Consequently, we use a three-part test to determine if evidence of other uncharged acts is admissible. Id.; see also *Bradshaw v. State*, 296 Ga. 650, 655 (769 SE2d 892) (2015). Our threshold inquiry is whether the evidence is probative of a material issue other than character. *Bradshaw*, 296 Ga. at 655; see also *Jones*, 297 Ga. at 159; *Huddleston v. United States*, 485 U. S. 681, 686 (108 SCt 1496, 99 LE2d 771) (1988). Common examples include "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

---

Thompson eventually pled guilty to criminal attempt to commit armed robbery, aggravated battery, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony.

mistake or accident." OCGA § 24-4-404 (b). Second, the evidence must meet the requirements of Rule 403—its probative value must not be substantially outweighed by its undue prejudice. *Bradshaw*, 296 Ga. at 655. And, third, the State must offer sufficient proof that the defendant committed the act. Id. "A trial court's decision to admit other acts evidence will be overturned only where there is a clear abuse of discretion." *Jones*, 297 Ga. at 159. We address the purported rationales for the admission of the subsequent robbery evidence in turn.

The trial court concluded that the Ward attempted armed robbery was admissible to show Thompson's motive to commit the murders. Evidence of the defendant's motive is of course relevant, even though it may incidentally place the defendant's character in evidence. "Motive has been defined as 'the reason that nudges the will and prods the mind to indulge the criminal intent.'" *Bradshaw*, 296 Ga. at 657 (citation omitted). "Overall similarity between the charged crime and the extrinsic offense is not required when the offense is introduced to show motive." *Brooks v. State*, 298 Ga. 722, 726 (783 SE2d 895) (2016) (punctuation and citation omitted). "Even so, to be admitted to prove motive, extrinsic evidence must be 'logically relevant and necessary to prove

13

something *other than the accused's propensity* to commit the crime charged.'" Id. (emphasis added and citation omitted).

The fact that Thompson may have committed a similar type of crime—an armed robbery coordinated with a group of perpetrators—is not enough to show motive for the murders at issue under 404 (b). *United States v. Ricks*, 643 F. App'x 894, 897 (11th Cir. 2016) (evidence of defendant's prior conviction for robbery should not have been admitted under 404 (b) during his carjacking trial; the alleged similarities between the two crimes—use of guns, physical force, masks, and co-conspirators fleeing police in a car—are all common in robberies); see also *Brooks*, 298 Ga. at 726-727.

The State alleged that the murders and the subsequent attempted armed robbery showed that Thompson would shoot at people when he was angry. But the witness to the attempted armed robbery did not testify that Thompson used a gun during that crime. And the evidence in this murder trial did not indicate that Thompson was inside the apartment when the victims were shot. We are particularly unpersuaded that the presence of a gun at the scene of each crime is sufficient, without more, to show motive when there is no implication that the defendant was the one who used a gun during the crimes. There is no apparent reason that the subsequent armed robbery shows evidence of motive

14

rather than propensity. That later act was not connected to the murders, and the only similarities it shares with the murders are the all-too-common elements of guns and an assortment of co-conspirators. Thompson's participation in a crime that involved a gun, attempted robbery, and co-conspirators is therefore not enough to show motive for the earlier unrelated crime.

The fact that the subsequent armed robbery was not admissible to show motive is not the end of our inquiry because the jury was also instructed that it could consider the subsequent act as evidence of plan or lack of mistake. But there is nothing in the record to suggest that the two crimes were part of a common plan. *United States v. McNair*, 605 F3d 1152, 1204 (11th Cir. 2010) (unindicted acts of bribery involving same defendants admissible to show common plan of bribing officials); see also *United States v. Dothard*, 666 F2d 498, 502 (11th Cir. 1982) (Rule 404 (b) requires more than simply showing a propensity to plan to commit the type of crime charged). Here, again, the attempted armed robbery shows, if anything, merely a propensity to commit robbery, and not a common scheme or plan to commit robberies in a certain way.

Moreover, there is no allegation that Thompson accidently or mistakenly shot the victims or that he accidently or mistakenly stole their property. See *Parks v. State*, 300 Ga. 303, 306 (794 SE2d 623) (2016) (prior extrinsic act inadmissible to show knowledge and absence of mistake or accident where there was no question as to defendant's knowledge and defendant made no claim that he accidently or mistakenly shot victim). Nor do the two crimes share common perpetrators such that the subsequent crime demonstrates that Thompson knew during the first crime that one of the other perpetrators would use a gun. See *United States v. Sterling*, 738 F3d 228, 239 (11th Cir. 2013) (prior armed robbery involving defendant and codefendant admissible to show that defendant's knowledge that codefendant would use a gun in a subsequent armed robbery). Setting aside whether a defense of mistake or accident is a prerequisite to admission of evidence under Rule 404 (b) for this purpose, the circumstances here do not support admission. The attempted armed robbery occurred three and a half years after the murders at issue and did not involve the same group of people. Consequently, the attempted armed robbery evidence does little, if anything, to shed any light on whether Thompson knew that his alleged co-conspirators intended to rob and murder the victims in this case.

On appeal, the State contends that the evidence at issue was properly admitted to show intent. Whether it could have been or not, it wasn't. The trial court did not instruct the jury on intent. And before the evidence was admitted, Thompson specifically objected to any instruction on intent and the State agreed to remove the language. Under these circumstances, we decline to consider whether the evidence would have been admissible to show intent, although this declination should not be read as a suggestion that the answer would be different if we did consider intent. Accordingly, we conclude that the evidence of Thompson's subsequent attempted armed robbery was not properly admitted.

The trial court's error in admitting the subsequent armed robbery requires that Thompson be given a new trial unless we can conclude that the test for nonconstitutional harmless error has been satisfied. In other words, we must examine "whether it is highly probable that the error did not contribute to the verdict." *Smith v. State*, 299 Ga. 424, 432 (788 SE2d 433) (2016) (citation omitted). Where evidentiary error is deemed harmless, it is often true that the evidence was only "marginal" to the prosecution's case. *Johnson v. State*, 301 Ga. 277, 280 (800 SE2d 545) (2017). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the

17

evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Peoples v. State*, 295 Ga. 44, 55 (757 SE2d 646) (2014) (internal citations and punctuation omitted); see also *Rivera v. State*, 295 Ga. 380, 382 (761 SE2d 30) (2014). That standard has not been met in this case.

To be sure, there is evidence that Thompson's phone was near the crime scene at about the time the murders took place. But the phone records are not precise enough to pinpoint exactly where Thompson was the night of the murders. Likewise, the evidence that Geddis's phone pinged off a tower near Thompson's house sometime after the murder took place does not establish that Thompson had the victim's phone. But unlike in cases where other direct or circumstantial evidence connects the defendant to the crime—thus making it highly unlikely that improper evidence influenced the jury's verdict—here the testimony of an ever-shifting witness (Heath), and the fact that the stripped Malibu was found near Thompson's home is the only other evidence tying Thompson to the crime. Moreover, the prosecution emphasized in closing that Thompson had a history of armed robbery—precisely the kind of propensity argument that Rule 404 (b) is designed to guard against.

So, although the properly-admitted evidence is sufficient to convict Thompson, we cannot say that it is so overwhelming, or that the improper character evidence was so marginal, that the jury's verdict was not likely to be impacted. We must reverse.

B. *Other Acts Evidence: Thompson's Drug and Gun Activities*. Although Thompson's convictions in this case will stand reversed, because the same issue may arise on retrial, we still address Thompson's contention that the trial court abused its discretion under Rule 404 (b) by admitting evidence that he was a drug dealer and sold his co-defendant, Russell, an AK-47. This time, however, we disagree that the trial court abused its discretion by admitting the challenged evidence.

Heath's statement to officers that Thompson was a drug dealer was used to prove the motive and circumstances immediately surrounding the murders. The evidence also provides context to Heath's testimony that he entered the car under the pretense that Thompson wanted Heath to test drugs. Evidence that Thompson was a drug dealer went directly to explaining why he would ask Heath to come with him to "test drugs," and was, therefore, admissible "even if it incidentally places [the defendant's] character at issue." *Davis v. State*, 301 Ga. 397, 401 (801 SE2d 897) (2017) (citing *United States v.*

*Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007); *United States v. Foster*, 889 F2d 1049, 1053 (11th Cir. 1989)).[9] The trial court, therefore, did not abuse its discretion in admitting this evidence.

And contrary to Thompson's contention before this Court, the jury heard Heath claim in a video interview that Thompson purchased a gun *from* Russell. Heath did not claim that Thompson sold the gun *to* Russell. Purchasing a gun is not the type of act that relates to Thompson's character. *Williams v. State*, 284 Ga. 849, 850 (672 SE2d 619) (2009) ("[E]vidence of gun ownership does not, in and of itself, impute bad character to a defendant."). We therefore find no abuse of discretion in the trial court's decision to permit the jury to hear evidence that Thompson purchased a gun from his co-defendant.

IV.

Thompson also contends that the trial court erred when it allowed Coey to testify about a conversation he had with Geddis on the night Geddis and Melody were murdered because the statement did not have the requisite

---

[9] Because this evidence was used to explain the sequence of events leading up to the crime, notice was not required. OCGA § 24-4-404 (b) (requiring a party to give notice when it intends to seek the admission of extrinsic act evidence). Instead, the evidence is intrinsic evidence because it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Edouard*, 485 F3d at 1344 (citation omitted).

20

guarantees of trustworthiness to be admissible pursuant to OCGA § 24-8-807. In that conversation, Geddis told Coey that he was waiting on someone to come over to sell him a .40 caliber gun. As it turns out, the same caliber gun was used to kill Geddis and Melody. We conclude that the trial court did not abuse its discretion when it determined that Coey's testimony was admissible.

Under the residual exception to the hearsay rule, a statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness is admissible if the court determines that:

> (1) The statement is offered as evidence of a material fact;
> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

OCGA § 24-8-807. A Rule 807 analysis must consider whether the statements have guarantees of trustworthiness given the circumstances under which they were made. *Rivers v. United States*, 777 F3d 1306, 1313 (11th Cir. 2015). We examine the trustworthiness of the declarant who originally made the statements, not the trustworthiness of the witness reciting the statements. Id. The standard of review for the admission of evidence under the residual exception is abuse of discretion. See id. And the standard of review is

21

meaningful: we are "particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." Id. at 1312 (quotation and citation omitted).

Much of the Rule 807 analysis is easily satisfied here. The statement that Geddis was waiting on someone to come to their home and sell him a .40 caliber gun was a material fact given that Geddis and Melody were later shot to death with a .40 caliber gun and there was no forced entry into his home. There was no comparable evidence available on this point; during the hearing, the State averred that it did not have any other evidence to show that one of the victims was planning to buy a handgun that night or that the victims expected someone to come by their home. Admitting the otherwise unavailable evidence that established Geddis was waiting for someone to come over on that day and sell him a gun of the same caliber that was used to kill him is consistent with the general requirement of providing a fair trial designed to reach the truth. See *United States v. Munoz*, 16 F3d 1116, 1122 (11th Cir. 1994). And circumstantial guarantees of trustworthiness exist because this was an innocent phone call between the victim and a member of his fiancée's

family, and the other evidence before the trial court corroborated Geddis's call to Coey. See *Tanner v. State*, No. S17A1024, 2017 WL 3686623, at *3 (Ga. Aug. 28, 2017) (declaration to mother consistent with other evidence was admissible under Rule 807).

Thompson urges that, even if Coey's statement is otherwise admissible under Rule 807, the trial court should have excluded the statement because the State failed to provide appropriate notice of its intent to use Coey's statement or testimony. The State counters that Coey's statement was included in the pretrial discovery materials given to Thompson in 2010. Under Eleventh Circuit precedent, pretrial notice of Rule 807 evidence is not fatal if the defendant is not harmed by the lack of notice and had a fair opportunity to address the statements. See *United States v. Parker*, 749 F2d 628, 633 (11th Cir. 1984). But that issue of notice is unlikely to arise during a retrial, so we leave for another day the determination of what constitutes "harm" and "fair opportunity" within the context of Rule 807.

## V.

Likewise, we decline to address Thompson's remaining contentions concerning the trial court's denial of his request for a continuance to locate a witness and the effectiveness of trial counsel.

23

Although we reverse Thompson's criminal convictions based on the incorrect admission of evidence, we again note that there was sufficient evidence to sustain the jury's guilty verdicts. Double jeopardy therefore would not bar a retrial in this instance.

Judgments reversed. All the Justices concur.