302 Ga. 774
FINAL COPY

S17A1479.  JOHNSON v. THE STATE.
S17A1480.  LEE v. THE STATE.


NAHMIAS, Justice.

Jonathan Johnson and Joshua Anthony Lee appeal their convictions for

malice murder in connection with the shooting death of Robert Cannon.

Johnson also appeals his conviction for possession of marijuana, and Lee

appeals his conviction for family violence battery in connection with the

beating of his wife, Kimberly Walker Lee (Walker).[1]  Both appellants contend

---

[1]  The crimes occurred on August 16 and 17, 2014.  On November 10, 2014, a Decatur County grand jury indicted Johnson, Lee, and Marquis Scott for malice murder, criminal attempt to commit kidnapping, and aggravated assault.  Johnson was also charged with possession of a firearm by a convicted felon and possession of less than an ounce of marijuana, and Lee was also charged with possession of marijuana with intent to distribute and family violence battery.  As part of a negotiated plea, Scott pled guilty to conspiracy to commit murder and was sentenced to ten years in prison; the other charges against him were dismissed.  He testified for the State at Johnson and Lee's trial, which was held from November 2 to November 6, 2015.  Johnson and Lee were found guilty of malice murder and aggravated assault and not guilty of attempted kidnapping.  Johnson was also found guilty of possession of marijuana, and Lee of family violence battery.  Johnson's firearm charge was nolle prossed, and the court directed a verdict of not guilty on Lee's drug charge.  Johnson and Lee were each sentenced to life in prison for malice murder and 12 concurrent months for their additional conviction; the aggravated assault count merged.  They filed timely motions for a new trial, which they each later amended.  After an evidentiary hearing, the trial court denied the motions on December 30, 2016.  Johnson and Lee filed timely notices of appeal, and their cases were docketed in this Court for the August 2017 term.  Johnson's case was orally argued on August 14,

that the trial court erred in denying their claim of racial discrimination in jury selection under Batson v. Kentucky, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986).  Lee also disputes the sufficiency of the evidence supporting his convictions, the trial court's denial of two motions for mistrial, and three instructions the court gave the jury.  Finding no reversible error, we affirm.

1.    Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.  Lee and Walker knew each other from childhood and had an on-and-off romantic relationship.  They had one child together, and they married in November 2013.  Shortly after their marriage, Lee began spending nights with Latoya Harris, with whom he also had a child, and Walker began a relationship with Cannon.  Walker was saving up money to pay for a divorce.  Despite their separation, Lee, who had beaten Walker in the past, continued to monitor her and got angry when she was with other men, including threatening to kill her.

On the night of August 16, 2014, Lee left Harris's house in her green Ford Explorer.  Although Lee said he was going to the store, Harris suspected he was

---

2017, and Lee's case was submitted on the briefs. They have been consolidated for opinion.

2

going after Walker or Cannon; she sent a text message to a friend saying, "[Lee] done took my sh*t once again trying to go either kill kim or cannonball." A few minutes after Lee left, Johnson and Marquis Scott arrived at Harris's house looking for Lee. Since he was not there, they called him and then left the house. Later that night, Lee drove the Explorer to Scott's sister's house and picked up Johnson and Scott. Scott, who was sitting in the back seat, saw a long gun on the floorboard.

Lee stopped the car shortly before midnight. All three men got out and walked across a field toward a Chevrolet, which was parked in front of Cannon's mother's house. Lee told Scott to go behind the car to see if Walker was there. Scott reported back that Walker was in the car having sex with a man. Lee, Johnson, and Scott then approached the Chevrolet together. Lee went to the passenger's side, pulled Walker out of the car by her hair, and began to hit her head with something she could not identify, causing a large knot on her head. Johnson and Scott went to the driver's side and attacked Cannon, putting him in a headlock. Cannon said, "Let me up" and "Don't shoot." Lee ran to the other side of the car, joining Johnson and Scott. Walker heard someone say "Shoot his ass," and then gunshots were fired. Cannon was shot

3

at least six times. Lee, Johnson, and Scott ran back to the Explorer and drove away.

A man who lived near the crime scene heard gunshots around midnight and saw three men get into an Explorer; he recognized two of the men as Lee and Johnson. When he went outside, the neighbor found Cannon and Walker wounded and stayed until an ambulance arrived. When the neighbor asked Cannon who shot him, Cannon said "Josh Lee" and "Josh Lee d'em," which the neighbor understood to mean that Lee had been with other people. Walker said that her husband was the one who hit her. Officers from the Decatur County Sheriff's Office soon arrived at the scene. An officer asked Cannon who shot him, and Cannon again said "Josh Lee." Walker also again identified Lee as her attacker, and she said she saw two other shadowy figures whom she could not identify. Cannon was taken to the hospital, where he died from his gunshot wounds.

Meanwhile, Lee drove Johnson and Scott a short distance before parking in a residential area. Scott called his cousin to pick them up. A woman in the area, who knew Lee, saw him and two other people run from her backyard shed and get into a car around this time. Scott's cousin drove them to Ashton

4

Moore's house, where Scott was staying. Moore made Lee leave because she did not know him.

Several hours after the shooting, officers went to Harris's house looking for Lee. While they were there, Lee called Harris asking for a ride. One of Harris's friends agreed to pick Lee up and to let the officers follow her. After Lee got in her car, the officers pulled them over and found Lee lying on the back seat floorboard.

Around noon on August 17, officers went to Moore's house. Scott yelled a warning when he saw them and dropped a magazine clip on a table; Johnson picked it up; and both men ran to a back bedroom. Officers found Scott on the bed pretending to be asleep and Johnson hiding in a closet under a pile of clothes. When officers searched Johnson, they found some marijuana as well as the magazine clip, which matched a 9mm rifle found at the house. Ballistics testing later showed that shell casings and projectiles found at the shooting scene and inside the Chevrolet were fired from that rifle. Moore said that she did not keep guns in the house. Black Polo and Nike Air Force One shoes were found at Moore's house that matched shoeprints found at the house where Lee and the two other people were seen running from the shed. Moore said she had

5

seen Johnson wearing the Polo shoes and Scott wearing the Nike shoes the day before the shooting. Additionally, a cell phone with "selfies" of Johnson was found between the abandoned Explorer and the shed. Lee's fingerprints were found in the Chevrolet, and Scott's and Johnson's fingerprints were found in the Explorer.

Lee and Scott were interviewed while in custody. Lee admitted that he went to the area where Cannon was shot. Scott nodded his head affirmatively when he was asked if Johnson had shot the victim, and he said they brought the gun "to scare." Scott testified at trial that he did not see Johnson or Lee take a gun out of the Explorer and he did not know which one shot Cannon. Johnson and Lee did not testify at trial.

2. Although only Lee has raised a challenge to the legal sufficiency of the evidence under Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), as is our practice in murder cases, we have considered the sufficiency of the evidence to support both appellants' convictions. As summarized in Division 1 above, sufficient evidence was presented at trial to prove that either Johnson or Lee shot and killed Cannon and that the other appellant was a party to the crime. See OCGA § 16-2-20 (defining parties to a

6

crime).

"While proof of a shared criminal intent with the actual perpetrator is necessary to establish that one is a party to the crime, 'shared criminal intent may be inferred from the person's conduct before, during, and after the crime.'" Bowen v. State, 299 Ga. 875, 877 (792 SE2d 691) (2016) (citation omitted). Johnson, Lee, and Scott traveled together with a rifle to the scene of the shooting; Lee had a motive to kill Cannon; Cannon was first attacked by Johnson and Scott and then shot repeatedly once Lee joined them on Cannon's side of the car; Johnson, Lee, and Scott left the scene together and tried to hide in Moore's house; Johnson and Lee both were found attempting to hide from the police, Johnson under a pile of clothes and Lee on a car floorboard; and Cannon said that Lee shot him, while Johnson was found in the same house as, and with a clip for, the murder weapon. This evidence was sufficient for a rational jury to find beyond a reasonable doubt that both men were guilty of murder. See Jackson, 443 U.S. at 319. The evidence was also sufficient to support Johnson's conviction for marijuana possession, as police officers found marijuana when they searched him, and Lee's conviction for family violence battery, as his estranged wife identified him as her assailant. See id.

7

3.    Both Johnson and Lee contend that the trial court erred when it denied their Batson challenge alleging racial discrimination in the selection of the jury.  See Batson v. Kentucky, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986).  This contention fails because the court's finding that the prosecutor's peremptory jury strikes were not racially motivated was not clearly erroneous.[2]

(a)    At trial, the jury venire was composed of 40 people — 16 black potential jurors (40%) and 24 white potential jurors (60%).  The State used its peremptory strikes to remove nine black potential jurors and one white potential juror.  The jury ultimately selected had three black jurors (25%) and nine white jurors (75%).  When the appellants raised a Batson challenge, the trial court ruled that they had failed to show a prima facie case of discrimination, but asked the State to offer its reasons for striking each juror anyway.  The district attorney said that he struck seven of the nine black potential jurors because they had

---

[2]  Only Johnson presents an argument in his brief in support of this enumeration of error; Lee's brief merely "adopts and incorporates" Johnson's argument and citations.  Because this claim is without merit, we may assume without deciding that Lee has sufficiently raised the claim.  We note, however, that this Court's Rule 22 says, with emphasis supplied: "Any enumerated error not supported by argument or citation of authority *in the brief* shall be deemed abandoned. . . ."  See Humphrey v. Riley, 291 Ga. 534, 546 (731 SE2d 740) (2012).  Additionally, incorporation of arguments from other sources may not be used to avoid the page limitation for briefs set by Rule 20.

family members who had been arrested or tried for criminal offenses.[3]  The district attorney also said that he had identified five white potential jurors with negative law enforcement experiences, either personally or through their family. One of those was the white juror he struck.  He did not strike the other four because one had a son whose criminal charges were later dropped and the other three were in the alternate portion of the juror panel.

During voir dire, the prosecutor had not questioned any of these potential jurors about their family experiences with law enforcement.  Instead, the district attorney explained to the trial court that he obtained this information when he reviewed the juror list with an assistant district attorney, members of the Bainbridge Police Department and Probation Office and the Decatur County Sheriff's Office, and a former employee of the Sheriff's Office.  The district attorney also ran the names on the juror list through a computer program showing any prior arrests in the county.  Johnson and Lee did not dispute the district attorney's information or seek to recall any jurors to question them further.  Based on the prosecutor's explanation, the trial court ruled that "the

---

[3] The district attorney gave other reasons for striking the remaining two black jurors.  Those reasons were based on information elicited during voir dire and are not disputed on appeal.

State has articulated race-neutral reasons for the exercise of its peremptory challenges" and denied the <u>Batson</u> motion.

After trial, at the motion for new trial hearing, Lee called four of the black potential jurors whom the State struck, and they each testified that the State's claim about their familial relationship to someone who had been arrested was inaccurate.[4] The first juror explained that the man to whom the prosecutor said she was related was actually part of a different family with the same last name. The second juror said she did not know the person to whom she was allegedly related. The third juror said she was not related to one person the prosecutor claimed was her relative, and while she had been related by marriage to the other person the prosecutor identified, she had never met him and had been divorced for about 17 years. The final juror, who the district attorney said had a son who had been prosecuted for drug crimes, testified that she had no children.

The trial court considered this testimony, but concluded that the district attorney's intention in striking these jurors was not racially discriminatory:

---

[4] As to the three other black potential jurors the State struck on this ground, Johnson's attorney told the court at the motion for new trial hearing that one of them did have the family ties asserted by the State and he was unable to make contact with the other two.

At trial the State provided legitimate reasons for [the] strikes which were in no way racially motivated. The fact that some [of] the information provided by law enforcement to the State later proved to be inaccurate is irrelevant since there was a good faith basis for the State to rely on information provided to them prior to trial. The Defendants have failed to show any scintilla of ill will or deceitful motive on behalf of State or law enforcement to purposefully attempt to strike any traverse juror based on race or any other Batson related demographic.

(b)  A Batson challenge involves three steps: "'(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.'" Coleman v. State, 301 Ga. 720, 723 (804 SE2d 24) (2017) (citation omitted). As to the first step, the trial court determined that the appellants had not made a prima facie showing of racial discrimination, but the court proceeded to the second step anyway. We therefore need not address whether the court correctly decided the prima facie issue, because the question is moot. See Hernandez v. New York, 500 U.S. 352, 359 (111 SCt 1859, 114 LE2d 395) (1991) (plurality) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the

preliminary issue of whether the defendant had made a prima facie showing becomes moot."); Lewis v. State, 262 Ga. 679, 680 (424 SE2d 626) (1993) (same).

"At the second step, all that is required is for the proponent of the strike to provide a *facially* race-neutral explanation for the strike; this explanation need not be 'persuasive, or even plausible.'" Coleman, 301 Ga. at 723 (citation omitted; emphasis in original). The appellants acknowledge that the trial court correctly found that a negative experience with law enforcement by a juror's family member is a race-neutral explanation for a peremptory strike of the juror. See, e.g., Alexander v. State, 273 Ga. 311, 312 (540 SE2d 196) (2001) ("Our precedent shows that the criminal arrest history of a prospective juror's family members is a sufficiently race-neutral reason to satisfy the dictates of Batson.").

At the third step of the Batson analysis, the trial court "'makes credibility determinations, evaluates the persuasiveness of the strike opponent's prima facie showing and the explanations given by the strike proponent, and examines all other circumstances that bear upon the issue of racial animosity.'" Coleman, 301 Ga. at 723 (citation omitted). "'A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great

12

deference and will not be disturbed unless clearly erroneous.'" (citation omitted) Woodall v. State, 294 Ga. 624, 627 (754 SE2d 335) (2014).  In this case, it appears that the trial court improperly skipped step three at trial, denying the Batson motion after ruling that the State had "articulated race-neutral reasons," without further argument from the parties or a finding regarding discriminatory intent.  Compare Coleman, 301 Ga. at 723-724 (explaining that the trial court "implicitly engaged in the third step" of Batson by hearing arguments from the defense as to why each reason proffered by the prosecutor was inadequate and then making its own findings as to each juror).

Any error the court made in missing step three at trial was cured, however, by the court's resolution of the appellants' motions for new trial.  See Staples v. State, 209 Ga. App. 802, 802-803 (434 SE2d 757) (1993) (explaining that the trial court's error in not completing the third step at trial "may be cured by a post-trial hearing on the Batson challenge").  See also Weems v. State, 262 Ga. 101, 102 (416 SE2d 84) (1992) (remanding for the trial court to determine at a post-trial hearing whether peremptory strikes were racially motivated).[5]  After

---

[5]  It is certainly preferable, however, for the trial court to respond to a Batson challenge by clearly following the three-step analysis when the challenge is raised at trial and "'clearly stat[ing] on the record its reasoning and conclusions as to *each step* of the inquiry.'"  Coleman, 301 Ga. at

hearing testimony from potential jurors who were struck and the appellants' arguments against the prosecutor's proffered reasons for striking the challenged jurors, the trial court expressly found that the district attorney's reasons for the peremptory strikes were "legitimate" and "in no way racially motivated." This finding, like most <u>Batson</u> decisions, turned largely on an evaluation of the credibility of the attorney who made the strikes, and "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." <u>Smith v. State</u>, 264 Ga. 449, 454 (448 SE2d 179) (1994) (quoting <u>Hernandez</u>, 500 U.S. at 365 (punctuation omitted)). See also <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477 (128 SCt 1203, 170 LE2d 175) (2008) ("The trial court has a pivotal role in evaluating <u>Batson</u> claims. Step three of the <u>Batson</u> inquiry involves an evaluation of the prosecutor's credibility, and 'the best evidence (of discriminatory intent) often will be the demeanor of the attorney who exercises the challenge.'" (citations omitted)).

It is troubling that the information on which the district attorney relied in making four of his ten peremptory strikes was later shown to be incorrect, but

_____

724 n.7 (citation omitted; emphasis in original).

14

such later-revealed inaccuracy does not establish that the prosecutor's professed reasons for the strikes were necessarily a pretext for invidious discrimination. "Batson is only about *racial discrimination* — it does not prevent the prosecution from relying on inaccurate (but race-neutral) information in striking jurors." Coleman, 301 Ga. at 725 (emphasis in original). See also Lee v. Commr., Ala. Dept. of Corr., 726 F3d 1172, 1226 (11th Cir. 2013) ("The conclusion that an honestly mistaken but race-neutral reason for striking a black venire member did not violate Batson was not unreasonable."); Lamon v. Boatwright, 467 F3d 1097, 1101 (7th Cir. 2006) ("Batson and its progeny direct trial judges to assess the *honesty* — not the accuracy — of a proffered race-neutral explanation." (emphasis in original)).

Of course, a prosecutor who gives false reasons for peremptory strikes may quickly lose credibility with the court, and reasons that are knowingly or patently false when given will likely be found to be pretextual. But in this case there is no evidence that the district attorney knew or even suspected that the information on which he relied in making the disputed strikes was inaccurate, and there was no suggestion at trial that the information was inaccurate. In fact, the confusion regarding two of the struck jurors' alleged family members

15

appears to stem from a shared family name and a divorce. What happened regarding the other alleged family ties that the testifying jurors said did not exist is less understandable — but that alone does not establish that the trial court's first-hand evaluation of the district attorney's credibility was clearly erroneous.

The appellants also argue that the district attorney's choice not to question the prospective jurors about their family links to arrests or prosecutions is evidence that he acted in bad faith. Although the prosecutor could have posed such questions, he was not required to prolong voir dire and potentially embarrass the prospective jurors by interrogating them about their criminally inclined family members. Batson does not require that the reasons for striking a jury come only from voir dire. See Alexander, 273 Ga. at 312 ("[I]n exercising a peremptory strike, the prosecution 'may rely on information and advice provided by others so long as this input is not predicated upon the race of the prospective juror.'" (citation omitted)). See also Coleman, 301 Ga. at 725-726 (explaining that "a defendant is not entitled to 'discover directly the information obtained by the State in preparing for its jury selection.'" (citation

16

omitted)).[6]

The trial court's finding that the district attorney's professed reason for striking the disputed jurors was not a pretext for racial discrimination is supported by the evidence that he applied the same criterion to potential jurors of all races. The prosecutor identified five white potential jurors with negative law enforcement experiences, struck one of them, and gave legitimate explanations for not striking the other four. The appellants have not shown that the State treated potential jurors known to be similarly situated differently because of their race. See United States v. Houston, 456 F3d 1328, 1338 (11th Cir. 2006) ("'[C]omparing the attributes of the black and white venire persons will aid the trier of fact and a reviewing court in determining whether the asserted reasons are pretextual or not.'" (citation omitted)). Recognizing the "great deference" we owe to the trial court's finding that the prosecutor's peremptory strikes were not racially motivated, we cannot say that finding was

_____

[6] The appellants ask this Court to require attorneys to offer "competent evidence" to support their proffered race-neutral reasons for striking jurors. The appellants acknowledge that such proof has not been required as a matter of federal constitutional law under Batson and its progeny, but they ask us to impose such a requirement pursuant to Georgia's constitutional equal protection guarantee, see Ga. Const. Art. I, Sec. I, Par. II. We will not consider this issue because neither appellant raised it in or obtained a ruling on it from the trial court when the State proffered its race-neutral reasons. See Brockman v. State, 292 Ga. 707, 731 (739 SE2d 332) (2013) ("Because the State constitutional issue was not raised or ruled on below, it is waived on appeal." (emphasis omitted)).

17

clearly erroneous. Woodall, 294 Ga. at 627.[7]

Contentions Raised Only by Lee

4. Lee argues that the trial court erred in denying his two motions for mistrial. "'Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial.'" Grissom v. State, 296 Ga. 406, 414 (768 SE2d 494) (2015) (citation omitted).

(a) On the evening of the first day of trial, a local television station broadcast and posted a story about the case. The next morning, Lee moved for a mistrial. The trial court asked the jurors:

_____

[7] We note that attorneys must be cautious when striking prospective jurors using criteria that may disproportionately impact a certain race. See Houston, 456 F3d at 1336 ("Houston include[d] in his briefs sociological data indicating that significantly more blacks than whites, as a percentage of their relative subgroups, are convicted of crimes in the United States."). "The Supreme Court has held that evidence that the prosecutor used a sorting device with a disparate impact on different races may be considered as evidence of purposeful discrimination at Batson's third step." Id. at 1337. But the trial court is not required to find discriminatory intent based on such circumstantial evidence, see id., and the court here did not. Again, the trial court's finding based on the totality of the circumstances is entitled to great deference, and it was not clearly erroneous. In fact, family members' negative experiences with law enforcement are reasons for striking prospective jurors frequently given by prosecutors and found not racially discriminatory by courts. See, e.g., Alexander, 273 Ga. at 312; Houston, 456 F3d at 1337.

18

Ladies and Gentlemen, the Court would like to inquire whether any of you observed any program on WALB last night or this morning regarding this case. Did any of you view any such matter that was regarding this case that was on Channel 10? None of you? Okay. Have any of you had any communication on any social media regarding this case? If you have had any, please raise your hand. It appears to the court that the answers to both of those questions was no.

Because none of the jurors indicated that they had seen the story or had any discussion on social media about the case, the court did not abuse its discretion in denying the mistrial motion. See Allen v. State, 296 Ga. 785, 787 (770 SE2d 824) (2015).

(b) Lee also moved for a mistrial after the following exchange occurred when his counsel was cross-examining an officer the State had called near the end of its case-in-chief:

COUNSEL: [Walker] didn't see who had the gun though?
WITNESS: No. I asked her point-blank, did you see Josh Lee with the gun, and she said, no. I asked her did she see the other individuals with a gun and she said, no. But then I asked her, I said, well, who shot Cannonball? And she said, I don't know. Josh Lee, he pulled a gun on me in the past. He probably shot him.

Lee's counsel stopped questioning the witness, asked to address a matter outside of the jury's presence, and then moved for a mistrial on the ground that this testimony improperly put Lee's character into evidence and had no probative

19

value. The trial court denied the motion. The jury had already heard Walker's testimony that Lee was violent toward her, threatened to kill her, and continued to monitor her after she ended their relationship, as well as Harris's testimony that she suspected on the night of the murder that Lee had left to kill Walker or Cannon. Thus, while the officer's response was objectionable, a mistrial was not essential to preserve Lee's right to a fair trial, and the trial court did not abuse its discretion in denying the mistrial motion. See Hood v. State, 299 Ga. 95, 100 (786 SE2d 648) (2016).[8]

5. Lee also argues that the State failed to prove venue beyond a reasonable doubt. See Thompson v. Brown, 288 Ga. 855, 855 (708 SE2d 270) (2011) (explaining that venue is a jurisdictional element of every crime that the State must prove beyond a reasonable doubt). However, the State elicited evidence that the crimes occurred in Decatur County from the witness who lived near the crime scene and waited with Cannon and Walker for the ambulance:

---

[8] In his brief, Lee also complains that the trial court gave no curative instruction. At trial, the State asked for a curative instruction if the court found the comment to be prejudicial, but Lee did not join that request. It may have been advisable for the trial court to give a curative instruction to address the portion of the officer's answer that went beyond the scope of the question. See, e.g., Dublin v. State, 302 Ga. 60, 67 (805 SE2d 27) (2017) (noting the trial court's curative instruction). However, even assuming that the court erred in not giving such an instruction, the error was harmless, as the evidence of Lee's guilt was strong, including Cannon and Walker identifying him as their attacker. See Geiger v. State, 295 Ga. 190, 194 (758 SE2d 808) (2014).

Q: Where do you live, Mr. Casteel?
A: 175 Andrews Road, Attapulgus.
Q: Is that down off Fowlstown Road, down in there?
A: Yes, sir.
Q: Is that near a place called 121 Philyaw [the crime scene]?
A: Yes, sir.
Q: And how long have you lived down there?
A: Twenty-something years.
Q: Okay. You pretty much know everybody down there?
A: Yes, sir, I do.
Q: And were you living down there and present down there back on the early morning hours of August 17th, 2014?
A: Yes, sir.
Q: Is that located here in Decatur County, that area?
A: Yes, sir.

The jury could derive from this testimony that the crime scene was part of "that area" that the witness said was located in Decatur County. See Jones v. State, 301 Ga. 1, 4 (799 SE2d 196) (2017) ("'[T]he determination of whether venue has been established is an issue soundly within the province of the jury.'" (citation omitted)). Additional evidence of venue was provided by several witnesses who testified that they were employed by the Decatur County Sheriff's Office when they worked on the case, where nothing in the record suggested that any such official had multi-jurisdictional authority. See Propst v. State, 299 Ga. 557, 561 (788 SE2d 484) (2016). Thus, the evidence proving venue was sufficient.

21

6. Finally, Lee argues that the trial court erred in its instructions to the jury on alibi, voluntary manslaughter, and aggravated assault. Although the court made mistakes as to each of these charges, there was no reversible error.

(a) The trial court gave the following jury instruction on alibi: "Now the Defendants contend that they were not present at the scene of the alleged offense at the time of its commission." Lee argues that this was error because alibi was only Johnson's defense; Lee never denied being at the scene of the shooting. Although the court should not have attributed Johnson's defense to Lee as well, this error was harmless, because there was no evidence or argument presented by any party suggesting that Lee was not at the crime scene, so the jury would not have been misled by the charge. See Wetzel v. State, 298 Ga. 20, 36 n.17 (779 SE2d 263) (2015).

(b) The trial court also made a mistake when it gave the following charge on voluntary manslaughter:

> If the evidence shows that the defendant killed the alleged victim beyond — with malice and not in a spirit of revenge but under a violent, sudden impulse of passion created in the defendant's mind by ongoing adultery or the recent discovery of past adultery on the part of the victim, you would be authorized to consider whether or not the defendant is guilty of voluntarily, as I will define it.

22

This slip of the tongue — saying "voluntarily" instead of "voluntary manslaughter" — also was not likely to have misled the jury. The court went on to correctly explain that the jury should "determine whether mitigating circumstances, if any, would cause the offense to be reduced to voluntary manslaughter" and correctly defined voluntary manslaughter. The court also instructed as to the murder count that the jury should indicate on the verdict form if it found either appellant "guilty of the lesser crime of voluntary manslaughter." Thus, in the context of the entire charge, the jury was adequately apprised of the lesser included offense of voluntary manslaughter. See Delacruz v. State, 280 Ga. 392, 398 (627 SE2d 579) (2006) ("'A mere verbal inaccuracy resulting from a slip of the tongue which does not clearly mislead or confuse the jury is not reversible error.'" (citation omitted)).

(c) Finally, the trial court gave the wrong aggravated assault instruction when it first instructed the jury, defining aggravated assault as assault with a deadly weapon rather than as assault with intent to murder, the crime for which Lee and Johnson were indicted. After Lee objected to this instruction, however, the court recalled the jury, advised the jury that the court misspoke in defining aggravated assault, instructed the jury to disregard the first definition, and then

23

charged the jury on aggravated assault with intent to murder. The court also instructed the jury that the State was required "to prove every material allegation of the indictment and every essential element of the crime." This was sufficient to cure any confusion. See Simpson v. State, 302 Ga. ___, ___ (808 SE2d 718) (2017). Moreover, Lee's aggravated assault verdict merged into his malice murder conviction, so even if any harm had been done, it would be moot. See Hickman v. State, 299 Ga. 267, 272 (787 SE2d 700) (2016).

Judgments affirmed. All the Justices concur.

Decided January 29, 2018.

Murder. Decatur Superior Court. Before Judge Cato.

Patrick E. Chisholm, for appellant (case no. S17A1479).

Megan A. Lane, for appellant (case no. S17A1480).

Joseph K. Mulholland, District Attorney, Craig E. Miller, Moruf O. Oseni, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General, for appellee.