306 Ga. 894
FINAL COPY

S19A0616. MYRICK v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Andre Myrick was convicted of felony murder and a firearm offense in connection with the shooting death of Kenneth Bevis. On appeal, he argues that the trial court erred by denying his *Batson* challenge as to three prospective jurors. He also argues that the court erred by denying his request for a mistrial after the jury heard a police detective refer to statements made by a witness who died before the trial and that the State committed prosecutorial misconduct by introducing this evidence. We affirm.[1]

---

[1] Bevis was killed on July 6, 2013. On October 4, 2013, a Fulton County grand jury indicted Appellant for malice murder, two counts of felony murder (based on aggravated assault and possession of a firearm by a convicted felon), aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. Appellant was tried from September 29 to October 5, 2015. The jury found him not guilty of malice murder, felony murder based on aggravated assault, and aggravated assault, but guilty of felony murder based on possession of a firearm by a convicted felon and both firearm charges. The trial court merged the possession of a firearm by a convicted felon count into the felony murder conviction and sentenced Appellant to serve life in prison for felony murder and five

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the morning of July 6, 2013, Bevis left his apartment in Atlanta, where Andrea Barry was sleeping, and picked up Kari Staymosse from the hotel where she was living. Bevis and Staymosse planned to use crack cocaine together. They stopped at a convenience store to get supplies for their crack pipe and then went to Bevis's apartment. When they arrived there around noon, Appellant and Barry were standing in the living room near the front door. Bevis and Staymosse knew Appellant, because they would sometimes use drugs together and Appellant used to live in Bevis's apartment building.

Barry said to Bevis and Staymosse, "Thank God you are here"; she then retreated to the bedroom. Bevis asked Appellant what he was doing there and said, "You are not welcome. Please leave." In

consecutive years for possession of a firearm during the commission of a felony. Appellant filed a timely motion for new trial, which he later amended with new counsel. After a hearing, the trial court denied the motion on April 6, 2018. On May 31, 2018, Appellant filed a motion for an out-of-time appeal, which the trial court granted on October 4, 2018. Appellant then filed a timely notice of appeal, and the case was docketed to the April 2019 term of this Court and submitted for decision on the briefs.

response, Appellant pulled out a gun and said, "I'm not going nowhere." Bevis put his hands up and sat down on the couch; Staymosse sat in a chair across from him. Appellant was talking very fast, sweating, and seemed "pretty sh[a]ken up." While Appellant was "ranting and raving" for about three minutes, Bevis kept his head down, shaking it. Then Appellant told Bevis, "Because of you, I will never see my daughter again," and shot Bevis in the chest.[2] After the gunshot, Barry, who had remained in the bedroom, jumped out of the bedroom window, causing a loud crash. When Appellant heard it, he fled the apartment. Staymosse immediately called 911. Barry, who had run to a nearby business, got an employee there to call 911 as well.[3]

When the police arrived, Bevis was dead. His body was

---

[2] There was no other discussion of Appellant's daughter at trial.

[3] The account of what happened in the apartment comes from Staymosse's trial testimony and her prior statement to the police. Barry had died by the time of trial, so she could not testify, and her statement to the police was not admitted. The two 911 calls were played for the jury. The police officer who responded to the 911 call testified that Barry flagged him down from the business, but he did not discuss what Barry told him.

3

slumped between the couch and coffee table. He had been shot once in the chest; the bullet's trajectory was consistent with the gun's being positioned higher than his chest. Staymosse identified Appellant as the shooter, described him, and picked him out of a photo lineup.[4]

At 12:21 p.m., about 15 minutes after the shooting, Leslie Breland called 911 to report that she had seen a man walking swiftly through her back yard, which was surrounded by a six-foot-high wooden fence, then through her garage and down her driveway. Two boards on the fence had been pulled up to create a hole in the fence. When the police arrived, they could not find the man. Breland was later shown a photo lineup and identified the photograph of Appellant, whom she did not know, as the man who walked through her yard. When measured through the woods behind Breland's yard, the distance to Bevis's apartment building was less than 700 feet. Around 6:00 p.m., another person called 911 and reported seeing a

_____

[4] Detective Darrin Smith, who interviewed Staymosse, testified that he also spoke to Barry and based on the information that he got from the two women, he developed Appellant as a suspect.

4

man who matched Appellant's description coming out of the bushes onto the road. That spot was about seven-tenths of a mile on foot from Bevis's apartment building. Police responded to that call quickly and located Appellant walking a short distance down the road. He was taken to the police station and interviewed.

Appellant told the police the following story. At the time of the murder, he was sleeping in Room 181 at the Cheshire Motor Inn. He woke up at 1:00 p.m., went to the InTown Suites to visit friends from 1:00 to 3:00 p.m., and then went to Midtown Bowling from 3:00 to 6:00 p.m. While there, he ordered a sandwich called a Big Nasty. Appellant said that although he was friends with Bevis, the last time they had seen each other was about two weeks earlier.

The path between the Cheshire Motor Inn and the InTown Suites would not have taken Appellant through the yard where Breland saw him. The police also determined that a man who had never met Appellant rented Room 181 from July 4 to July 6; although he left at 2:00 p.m. on July 5, so he was not there during the night before the murder, he did not check out and the room was

not rented to anyone else. And no one purchased a Big Nasty sandwich at Midtown Bowling between 3:00 p.m. and 6:00 p.m. on the day of the murder.

In addition, cell phone records showed that on July 3, three days before the murder, Appellant called Bevis seven times between 6:30 and 6:54 p.m. The next day, Appellant called Bevis seven more times between 9:04 and 11:40 p.m. Most of these calls were less than a minute, which a detective testified usually indicates that the call went to voicemail. The longest call lasted one minute and one second. Appellant did not call Bevis again, but at 12:11 a.m. on July 5, he sent a text message to Bevis saying, "I got those 50$ grams now and it's good." Bevis responded, "You need to lose this phone number. I don't need idiots hanging around me." Appellant answered, "I understand buddy but that was when i was getting high and this is now . . . things r getting back to the way i was mentall. But I must admit that somebody f**ked . . . Me up! Somebody put something in my drink or food or something & i think i knw who it was but they r gone."

Appellant did not testify at trial, but his video-recorded interview was played for the jury. His main defense theory was that the police did not do a thorough investigation, particularly because they relied so heavily on the word of Staymosse rather than treating her as a suspect.

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's usual practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder and possession of a firearm during the commission of a felony. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. (a) At the end of jury voir dire, Appellant raised a challenge

under *Batson v. Kentucky*, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986), based on the State's use of six of its eight peremptory strikes for jury members and both of its two peremptory strikes for alternates on prospective jurors who were African-American, meaning that the State used eight out of ten of its strikes (80%) on a group that made up only 36% of the jury venire. The trial court ruled that Appellant had made a prima facie case. The prosecutor then explained his reasons for each of the eight challenged strikes. Appellant conceded that the reasons for three of the State's strikes were race-neutral, and on appeal he does not challenge two other strikes.

As to the three strikes Appellant challenges here, the prosecutor offered the following reasons. Juror 9 was very young and once had her driver's license suspended for missing school. Juror 13 had a physical disability that could make it hard for him to sit for long periods, he was convicted of misdemeanor drug charges five years earlier, and his driver's license had been suspended. Juror 20 did not provide much information in response to questions and

seemed uncomfortable talking about her aunt's and uncle's use of heroin and crack cocaine, and the prosecutor "did not get a good vibe from her."

Appellant disputed each of these reasons. He argued that one of the jurors accepted by the State, who Appellant acknowledged was African-American, was close in age to Juror 9. Appellant argued that Juror 13 said his disability would not prevent him from serving and that another juror (also African-American) had a DUI, which would have included a license suspension. As to Juror 20, Appellant argued that two other jurors did not provide many answers on their questionnaire and another was soft-spoken. He further argued that Juror 20 was related to the aunt and uncle only by marriage and that the prosecutor's claiming not to get a "good vibe" was clearly pretextual.

The trial court ruled that the prosecutor's reasons were race-neutral and implicitly denied Appellant's *Batson* challenge, continuing the trial without any of the struck prospective jurors being placed on the jury. In its order denying Appellant's motion for

new trial, the court held that Appellant's *Batson* challenge lacked merit and expressly found that Appellant had failed to carry his burden to show the prosecutor's discriminatory intent after the prosecutor provided race-neutral explanations for the strikes.

(b) Appellant argues that the trial court erred by denying his *Batson* challenge because his arguments at trial in response to each of the prosecutor's explanations show that the prosecutor did not truly have race-neutral reasons for striking Jurors 9, 13, and 20.

> A *Batson* challenge involves three steps: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.

*Johnson v. State*, 302 Ga. 774, 779 (809 SE2d 769) (2018) (citation and punctuation omitted).[5]

Because the prosecutor offered explanations for the strikes at step two and the trial court ruled on the ultimate question of

---

[5] The trial court's rulings in its motion for new trial order cured any error that the court made in failing at trial to expressly consider the third step of *Batson* or rule on the *Batson* motion as a whole. See *Johnson*, 302 Ga. at 780.

10

intentional discrimination at step three, we need not decide whether the court correctly decided the step one prima-facie-showing question. See *Johnson*, 302 Ga. at 779. "'At the second step, all that is required is for the proponent of the strike to provide a *facially* race-neutral explanation for the strike[.]'" Id. (citation omitted; emphasis in original). At the third step, "the trial court makes credibility determinations, evaluates the persuasiveness of the strike opponent's prima facie showing and the explanations given by the strike proponent, and examines all other circumstances that bear upon the issue of racial animosity." Id. at 779-780 (citation and punctuation omitted). "[A] trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference [on appeal] and will not be disturbed unless clearly erroneous." Id. at 780 (citation and punctuation omitted). See also *Snyder v. Louisiana*, 552 U.S. 472, 477 (128 SCt 1203, 170 LE2d 175) (2008) ("Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who

11

exercises the challenge[.]" (citations and punctuation omitted)).

The prosecutor gave at least one race-neutral reason for each of the strikes — Juror 9's youth, Juror 13's physical condition and drug convictions, and Juror 20's demeanor when she talked about her aunt's and uncle's drug use. See *Walker v. State*, 281 Ga. 521, 522-523 (640 SE2d 274) (2007) (holding that a juror's youth and the involvement of a juror's friends or family in criminal matters are race-neutral reasons for peremptory strikes); *Williams v. State*, 271 Ga. 323, 324 (519 SE2d 232) (1999) (holding that the juror's involvement in criminal activity or prior convictions is a race-neutral reason for a peremptory strike); *Kelly v. State*, 209 Ga. App. 789, 791 (434 SE2d 743) (1993) (holding that doubts about a prospective juror's "health, stamina, and ability to sit through a lengthy trial and observe the witnesses" was a race-neutral reason to strike that juror). Appellant's attempts to refute these reasons were not compelling. His arguments that another juror was close in age to Juror 9 and that the juror with a DUI likely had his license suspended like Jurors 9 and 13 do not help him show that the

prosecutor's strikes were motivated by racial animus, because the two jurors who were not struck were also African-American. See *Demery v. State*, 287 Ga. 805, 808 (700 SE2d 373) (2010) ("'The opponent of the strike may carry its burden of persuasion by showing that similarly-situated members of *another* race were seated on the jury.'" (citation omitted; emphasis added)).

Moreover, Appellant's argument about Juror 20's limited answers and lack of a "good vibe," even if conceivably convincing with regard to a juror strike on those grounds alone, does not negate the other race-neutral reason the State gave for striking that juror — her apparent discomfort when she talked about her aunt's and uncle's criminal drug use. The trial court's ultimate finding that Appellant failed to prove discriminatory intent was not clearly erroneous. See *Johnson*, 302 Ga. at 781-782. Appellant's *Batson* claim cannot be sustained.

3. (a) As mentioned in footnote 3 above, Andrea Barry, who was in the apartment when Bevis was shot, died before trial. Because of her unavailability, at the beginning of trial, the prosecutor told the

13

trial court that he had spoken to Appellant's counsel and agreed that he would not introduce any of Barry's statements to police, because such statements would violate the Confrontation Clause of the Sixth Amendment to the United States Constitution. Notably, the State did *not* agree that it would eliminate any *mention* of Barry from the trial, nor did Appellant argue for such a purgation. In fact, the prosecutor explained to the court that he planned to introduce the 911 call made at Barry's direction, noting that Barry did not speak directly on the call but her voice could be overheard giving information to the person making the call. Appellant did not object.

When Detective Darrin Smith testified, the State played the video recording of his interview of Appellant. During the interview, Detective Smith made about a half-dozen references to two witnesses to the crime, including twice telling Appellant that the two witnesses had identified him as the shooter. After one of these references, Appellant moved for a mistrial, outside the presence of the jury, on the ground that the detective's statement implied to the jury that Barry had identified Appellant as the shooter, thereby

14

violating the Confrontation Clause as well as the State's agreement not to introduce Barry's statements. The prosecutor responded that the detective did not refer to Barry by name and that the statement, which was made while interviewing a suspect, was not offered to prove that there were truly two witnesses who identified Appellant as the shooter. The trial court summarily denied Appellant's mistrial motion, and Appellant asked for and was granted a continuing objection.[6] The court then allowed the State to resume playing the recording for the jury.[7]

(b) Appellant argues that the trial court erred by denying his motion for a mistrial because admitting the detective's recorded statements that were apparently about Barry violated the

---

[6] Appellant does not complain about the trial court's implicit overruling of this objection. Appellant did not ask for a limiting or curative instruction.

[7] The recording of the interview is in the record. It is not clear from the trial transcript, however, at what point in the interview Appellant moved for a mistrial, nor is it clear if the jury heard every reference to the two witnesses. At some point after the mistrial motion was denied, the prosecutor said that he was going to fast-forward through two portions of the recording due to the "court's prior ruling." It is not clear which ruling he was referring to; the attorneys and the court had a bench conference off the record, and when the trial resumed, what appear to be two short portions of the recording were skipped.

15

Confrontation Clause. Because Barry was unavailable, the Confrontation Clause prohibited the State from introducing into evidence any of her testimonial hearsay statements. See *Crawford v. Washington*, 541 U.S. 36, 68 (124 SCt 1354, 158 LE2d 177) (2004). But even assuming that the statements by Barry that the detective was purporting to convey to Appellant were testimonial (a question we need not decide), the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 59 n.9.  See also OCGA § 24-8-801 (c) ("'Hearsay' means a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The hearsay determination turns on whether Detective Smith, through his recorded statements to Appellant, told the jury what Barry said about the crime and whether that testimony was offered to prove the truth of what Barry said. As to the first question, we will assume for the sake of Appellant's argument that the jury understood the two witnesses to whom the detective referred to be Staymosse and

16

Barry.[8]

As to the second question, however, "the detective['s] statements were clearly not meant to establish as true that others had implicated [Appellant], but were simply a part of an interrogation technique." *Allen v. State*, 296 Ga. 785, 788 (770 SE2d 824) (2015).[9] See also *United States v. Fernandez*, 914 F3d 1105, 1111 (7th Cir. 2019) ("What [the officer] asked of or said to [the suspect being interviewed] during interrogation was not offered for its truth, but rather to establish what questions or statements [the suspect] was responding to and the effect the former had on [the suspect] as the listener."). This is apparent from the minimal

---

[8] Although Detective Smith never identified Barry by name, the jurors knew that she had been in the apartment and called 911. As noted in footnote 7, it is not clear how many or which references to the two witnesses the jurors heard. Some of the references revealed different details about the two witnesses, including that they were "girls," that they were "in the apartment," and that they knew Appellant. Appellant has not specifically relied on any of these details in his argument at trial or on appeal, but which details the jurors heard affects how likely it is that they identified Staymosse and Barry as the two witnesses.

[9] Although *Allen* was decided under Georgia's old Evidence Code, hearsay under the old Code, like hearsay as now defined in OCGA § 24-8-801 (c), was limited to out-of-court statements offered to establish "the truth of the matter asserted." See, e.g., *Cawthon v. State*, 289 Ga. 507, 509 (713 SE2d 388) (2011).

amount of detail included in the detective's varying accounts of the two witnesses' statements and the way in which the statements were framed. In Detective Smith's first mention of the two witnesses, he said that a "couple people" identified Appellant as "having some type of altercation" with Bevis and then shooting and killing him; the detective later told Appellant that the witnesses "say you shot him." The detective's other references to the witnesses are more vague: "two witnesses . . . saw it happen"; "two people put you there . . . [and] described exactly what happened"; "the witnesses and evidence will speak for itself"; and "I got two witnesses, I don't need much more than that."

Notably, the detective's description of the two witnesses who said they "saw" Appellant have an altercation with Bevis and then shoot him is actually inconsistent with Staymosse's testimony that Barry immediately went into a different room and did not see the shooting or what led up to it. And although we are assuming for the sake of argument that the jury figured out who the two witnesses were, Detective Smith never named them. The detective's

18

statements were clearly designed to convince Appellant to speak, rather than to provide him — or the jury — true accounts of witness statements. See *Allen*, 296 Ga. at 788 ("The detectives did not identify the 'buddies' mentioned, and no substance of any supposed statements was placed before the jury by the detectives' reference."). Accordingly, to the extent the jury could infer anything that Barry supposedly said from the detective's references to two witnesses in the recorded interview, those supposed statements were not hearsay, and their admission did not violate the Confrontation Clause. See id. Thus, the trial court did not err in denying a mistrial on this ground. See *Wade v. State*, 304 Ga. 5, 10 (815 SE2d 875) (2018).

(c) Appellant also argues that the trial court should have granted a mistrial on the ground that the detective's recorded statements violated the pretrial order prohibiting the admission of Barry's statements. In making this argument, Appellant seems to believe that he made a clear motion in limine to exclude Barry's statements and the trial court ruled on that motion. The record

shows, however, that Appellant did not file a written motion in limine, and to the extent that the pre-trial discussion about excluding Barry's statements could be characterized as an oral motion in limine, the trial court did not issue a ruling on it; instead, the State simply agreed that it would not introduce Barry's statements so as not to run afoul of the Confrontation Clause. As discussed above, the admission of the detective's statements in his interview of Appellant did not violate the Confrontation Clause. So even assuming there was an order based on the State's agreement, that order was not violated.

(d) Finally, Appellant argues that the prosecutor committed misconduct by willfully violating the purported trial court order and the State's agreement not to discuss Barry at trial. "[W]hen a defendant alleges a factually specific claim of prosecutorial misconduct, the defendant must show actual misconduct and demonstrable prejudice to his right to a fair trial in order to reverse his conviction." *Brooks v. State*, 305 Ga. 600, 606 (826 SE2d 45) (2019) (citation and punctuation omitted). Appellant has shown

neither. He has failed to show actual misconduct because, as explained above, there was no order on this issue and playing the detective's statements did not violate the State's agreement about Barry's statements. Appellant also has failed to show that the detective's statements were prejudicial. The detective's oblique references to two witnesses who identified Appellant did not likely add anything to the other testimony the jury heard — without Appellant's objection — that was clearly about Barry, including Detective Smith's trial testimony that he spoke to Barry and developed Appellant as a suspect based in part on what she told him.[10]

---

[10] Appellant complains broadly on appeal about the prosecutor's allowing Barry to "speak from the grave," although he does not clearly point to any evidence other than the interview recording to support his claim of prosecutorial misconduct. To the extent Appellant is arguing that the prosecutor committed misconduct by eliciting trial testimony about Barry from Staymosse, the responding police officer, and Detective Smith, he did not object to this testimony at trial. Thus, any claim of prosecutorial misconduct based on eliciting that testimony was waived. See *Grier v. State*, 305 Ga. 882, 887 (828 SE2d 304) (2019). Appellant does not enumerate the admission of this testimony as an evidentiary error, which could have made it subject to plain error review. See *Martin v. State*, 306 Ga. __ (__ SE2d __) (2019). See also *State v. Kelly*, 290 Ga. 29, 32 (718 SE2d 232) (2011) (explaining that although the appellant does not have to specifically ask for plain error review, he must

*Judgment affirmed. All the Justices concur.*

---

clearly enumerate the alleged error that is entitled to plain error review). In any event, such a contention would fail.

Murder. Fulton Superior Court. Before Judge Campbell.

*Dell Jackson*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Matthew D. O'Brien, Assistant Attorneys General*, for appellee.